# The State of Pennsylvania *v.* The Wheeling and Belmont Bridge Company, et al.

The power of congress to regulate commerce, includes the regulation of intercourse and navigation, and consequently, the power to determine what shall or shall not be deemed, in judgment of law, an obstruction of navigation.

The provisions of the act of congress passed August 31, 1852, (10 Stats. at Large, 112,) in its 6th and 7th sections declaring the bridges over the Ohio River at Wheeling and Bridgeport, to be lawful structures at their then height and position, and requiring the officers and crews of vessels navigating the Ohio River, to regulate their vessels so as not to interfere with the elevation and construction of said bridges, are within the legitimate exercise, by congress, of its constitutional power to regulate commerce.

The said sections of the aforesaid act of congress are not invalid by reason of the compact, in respect to the free navigation of the Ohio River, made between the States of Virginia and Kentucky, with the sanction of congress at the time the latter State was admitted into the Union.

Neither are they in conflict with the provision of the constitution of the United States, providing that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another."

As a general proposition it is true, that an act of congress cannot annul a judgment of the supreme court of the United States, or impair the rights determined thereby, especially as respects adjudications upon the private rights of parties; and hence the decree of this court heretofore rendered in this case, so far as it respects the costs adjudged to the complainant, is unaffected by the act of congress referred to.

But that portion of the decree of this court at the May term, 1852, in the case of the State of Pennsylvania *v.* The Wheeling and Belmont Bridge Company, which relates to the abatement of the bridge, proceeded upon the ground that the bridge was in conflict with the then existing regulations of commerce by congress, and was executory, depending upon the bridge continuing to be an unlawful obstruction to the public right of free navigation; and that right having since been modified by congress in the exercise of its constitutional power to regulate commerce so that the bridge is no longer an unlawful obstruction, the decree cannot now be enforced.

After the passage of the act of congress referred to, the bridge no longer being an unlawful interference with a public right, the defendant's authority to maintain it, in its then position and height, existed from the moment of the enactment; for their authority then combined the concurrent powers of both governments, state and federal, and if these are not sufficient none can be found in our system.

The complainant's motions for a writ of assistance to execute the decree of the 27th of May, 1852, by the abatement of the bridge and for a sequestration against the corporation and attachment against its officers for disobeying said decree are therefore refused; and the motions to punish the contempt of the corporation, and its officers in disobeying the injunction granted by Mr. Justice Grier, on the 27th of June, 1854, are also overruled, and the injunction is dissolved.

The decree for costs being unaffected by the act of congress, the motion for taxation and award of execution for their collection is granted.

This case was one of original jurisdiction in this court, upon the equity side; and may be said to be a continuation of the suit between the same parties reported in 13 How. 518.

By turning to that case, the reader will perceive that at page 627, a day was given to the plaintiffs to move the court on the subject of the decree. It is now proposed to continue the narrative from that time.

The motion made by the complainant and the motion made by the defendants to dismiss the suit, need not be particularly stated.

In the summer of 1854, the bridge was blown down by a violent storm, and the company were preparing to rebuild it according to the original plan, when the next step in the history of the case was taken.

On the 26th day of June, 1854, in vacation of the supreme court, the State of Pennsylvania, by her attorney-general and her counsel, Edwin M. Stanton, pursuant to previous notice served on the Wheeling and Belmont Bridge Company, appeared before the Honorable R. C. Grier, one of the justices of the supreme court of the United States, at chambers, and moved for an injunction as prayed for in a supplemental bill then exhibited. The substance and object of the bill is stated in the subjoined order.

On hearing the bill and affidavits, the following order was made and injunction granted.

" *In the Supreme Court of the United States.*

THE STATE OF PENNSYLVANIA    ⎫
                *v.*                       ⎬ In Equity.
THE WHEELING AND BELMONT BRIDGE COMPANY.   ⎭

Before the Honorable R. C. GRIER, one of the judges of the supreme court of the United States.

" Whereas, on the 26th day of June, 1854, at the United States court room in the city of Philadelphia, the State of Pennsylvania, by her attorney-general and counsel, exhibited before me, R. C. Grier, one of the justices of the supreme court of the United States, her bill of complaint in equity against the Wheeling and Belmont Bridge Company, setting forth, among other things, that the said Wheeling and Belmont Bridge Company is about to erect and construct a bridge over and across the eastern channel of the Ohio River at Wheeling, between Zane's Island and the main Virginia shore, at a less elevation than is prescribed by the decree of the supreme court of the United States heretofore rendered against said company on complaint of said State, whereby the navigation of the Ohio River by steamboats of the largest class will be obstructed, to the injury of the said State ; and in the vacation of the supreme court the said complainant hath applied to me for an injunction as prayed for in said bill against the said Wheeling and Belmont Bridge Company, and its president, managers, officers, engineers, agents, contractors, and servants, to enjoin them from erecting and constructing a bridge at the place aforesaid at a less elevation than is prescribed by the decree aforesaid, and from doing any act or thing to obstruct the navigation of the Ohio River, as prayed in said bill :

" And reasonable notice of said application having been given unto the said Wheeling and Belmont Bridge Company to appear before me, to resist said application, and the proofs and arguments of counsel being heard, it is considered and adjudged that an injunction, as prayed for in the said bill, be, and the same is hereby, allowed. And it is ordered that the writ of injunction of the United States of America be forthwith issued by the clerk of the supreme court of the United States, under the seal of the said court, against the said Wheeling and Belmont Bridge Company, its president, managers, officers, engineers, agents, contractors, and servants, and all persons acting by their instigation, authority, or procurement, or otherwise, commanding and requiring them, and every of them, under the penalty of the law, that they do forthwith and absolutely desist and abstain from erecting and constructing, or causing to be erected or constructed, any bridge, structure, or device, in, over, or across the eastern channel of the Ohio River, at Wheeling, between Zane's Island and the main Virginia shore, at a less elevation than is prescribed by the decree aforesaid of the supreme court of the United States against said bridge company, entered at the adjourned term in May, 1852, and from stretching, suspending, or placing, or causing to be stretched, suspended, or placed, any iron cables, ropes, wires, or chains, or any timber, structure, material, or thing whatsoever, in, over, or across the said channel, at a less elevation than is prescribed by the decree aforesaid, and from keeping and maintaining any cable, rope, wire, chain, timber, or thing whatsoever, suspended in, over, or across the said channel, at a less elevation than is prescribed by the decree aforesaid, and from doing, or causing to be done, any act or thing to obstruct the free navigation of said channel of the Ohio River."

" It is ordered that the marshal of the District of Columbia do forthwith serve said writ."

And the clerk of the supreme court of the United States is directed to file the bill of complainant on which the aforesaid application and allowance are made, and enter this order and issue the writ of injunction above allowed; and also, that he issue the writ of subpœna in chancery, to be served by said marshal, requiring said Wheeling and Belmont Bridge Company to appear, plead, answer, or demur to said bill within ninety days from the service of said writ.

Given under my hand, at Philadelphia, this 26th day of June, 1854.                                         R. C. GRIER,
*Associate Justice Sup. Court U. S.*

The preceding order having been filed in the office of the clerk

of the supreme court on the 27th day of June, a writ of injunction, with a certified copy of the decree of the supreme court, entered at May term, 1852, annexed thereto, was issued and delivered to the marshal of the District of Columbia, as follows:—

### THE UNITED STATES OF AMERICA.

*In the Supreme Court of the United States, ss.*

The President of the United States of America, to the Wheeling and Belmont Bridge Company, its president, managers, officers, engineers, agents, contractors, and servants, and to each and every of them, and to all persons whomsoever, greeting :

Whereas, the State of Pennsylvania hath made application before the Honorable R. C. Grier, one of the justices of the supreme court of the United States, for an injunction as prayed for in her bill of complaint exhibited before said justice, and filed in the supreme court of the United States :

And whereas, upon hearing of said application, the following order was made :—

[In the injunction, the preceding order was recited.]

We, therefore, having regard to the matter aforesaid, do strictly enjoin· and command the said Wheeling and Belmont Bridge Company, its president, managers, officers, engineers, agents, contractors, and servants, and all persons acting by their instigation, authority, advice, procurement, or otherwise, to observe and obey the aforesaid order and injunction.

Hereof fail not, under the full penalty of the law thence ensuing.

Witness the Honorable Roger B. Taney, chief justice of the supreme court of the United States, this 28th day of June, A. D. 1854.

Attest, WM. THOMAS CARROLL,
*Clerk of the Supreme Court of the United States.*

The writs of injunction being served upon the company by leaving a copy at its office and with its president and secretary, and also upon the managers of the company, they proceeded to erect the bridge notwithstanding the injunction, and it was completed in November.

At December term, 1854, the complainant, by her counsel, having given previous notice to the company, filed a motion for a sequestration against the company, for a contempt of court in disobeying the injunction, and a motion for an attachment

against the officers personally for their contempt in disobeying the injunction. · The motions were as follows :—

## *Motion for Sequestration.*

And now, to wit, at the December term, 1854, comes the State of Pennsylvania, by her attorney-general, and moves the court to order and direct a writ to be issued against the Wheeling and Belmont Bridge Company, to sequestrate its estate, real, personal, and mixed, and the rents, issues, and profits thereof, its privileges and franchises, goods, chattels, rights, credits, moneys, and effects, for a contempt of court, by breach of and disobedience to the lawful writ, process, orders, decree, and commands of the supreme court of the United States.

The breaches and disobedience to said writ, process, orders, decree, and commands aforesaid, are stated and charged specifically as follows :—

1. That after service upon the Wheeling and Belmont Bridge Company, by the marshal of the District of Columbia, of a copy of a writ of injunction issued out of said court, pursuant to an order of allowance made on the 26th day of June, 1854, by the Honorable R. C. Grier, one of the judges of the said supreme court, the said company have disobeyed said writ of injunction, and are engaged in doing and performing acts, and have caused and procured acts to be done, in disobedience of said injunction and of the process ˜and authority of said court.

2. That after service upon said company by the marshal aforesaid, of a copy of the decree entered by said supreme court at the adjourned term of May, 1852, in the case of The State of Pennsylvania *v.* The Wheeling and Belmont Bridge Company and others, said company have disobeyed said decree.

3. That since the service of the writ of injunction and decree as aforesaid upon said company, said company have stretched, suspended, and placed, and caused and procured to be stretched, suspended, and placed, iron cables, ropes, wires, or chains, over and across the eastern channel of the Ohio River, between Zane's Island and the main Virginia shore, at Wheeling, in disobedience of said injunction ; and have erected and constructed, and are engaged in erecting and constructing, and in causing and procuring to be erected and constructed, a bridge over and across the said channel, at a less elevation than is prescribed by the said decree of the supreme court of the United States, entered as aforesaid, at the adjourned term of May, 1852, and in disobedience of said writ of injunction ; and have kept and maintained, and are keeping and maintaining, cables, wires, chains,

33 *

timbers, and planks suspended in, over, and across the said channel, at a less elevation than is prescribed by the decree aforesaid.

4. That since the service of said writ and decree as aforesaid, the said company have obstructed the free navigation of the said channel of the Ohio River, and have caused and procured the same to be obstructed, and are now keeping the same obstructed, in breach and disobedience of said writ of injunction and decree. F. W. HUGHES,

*Attorney-General of Pennsylvania.*

## Motion for Attachment.

And now, to wit, at the December term, 1854, comes the State of Pennsylvania, by her attorney-general, and moves the court for an order that Charles Ellet, Jr., James Baker, and E. H. Fitzhugh stand committed to the jail of the District of Columbia, for a contempt of court, by breach of and disobedience to the lawful writ, process, order, decree, and commands of the supreme court of the United States.

[The breaches set out were the same as above.]

A motion for a writ of assistance to execute the decree of this court made in May, 1852, was also filed, praying the court to order and direct such a writ to the marshal of the District of Columbia.

A motion was also made for an award of execution for the costs decreed in May, 1852.

The defendants appeared by their counsel, and resisted the foregoing motions under the 6th and 7th sections of the act of congress, (10 Stat. at Large, 112,) entitled

"An act making appropriations for the service of The Post-Office Department during the fiscal year ending the thirtieth of June, one thousand eight hundred and fifty-three, and for other purposes.

SEC. 6. And be it further enacted, that the bridges across the Ohio River at Wheeling, in the State of Virginia, and at Bridgeport, in the State of Ohio, abutting on Zane's Island, in said river, are hereby declared to be lawful structures, in their present position and elevation, and shall be so held and taken to be, any thing in any law or laws of the United States to the contrary notwithstanding.

SEC. 7. And be it further enacted, that the said bridges are declared to be and are established post-roads for the passage of the mails of the United States, and that the Wheeling and Belmont Bridge Company are authorized to have and maintain their said bridges at their present site and elevation, and the officers

and crews of all vessels and boats navigating said river, are required to regulate the use of their said vessels and boats, and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation and construction of said bridges.

The defendants also moved to dissolve the injunction granted by Mr. Justice Grier.

At December term, 1854, these several motions came on to be heard, and were argued by *Mr. Edwin M. Stanton*, for the State of Pennsylvania and by *Mr. Johnson* and *Mr. Charles M. Russell*, for the defendants.

*Mr. Stanton*, for the complainant, made the following points, viz:—.

1. That at the date of the passage of the act of congress legalizing the Wheeling Bridge, the State of Pennsylvania had by the judgment of the supreme court of the United States, "a just and legal right to have the navigation of the Ohio River made free by the removal of the bridge, or by its alteration," in conformity with the decree entered in May, 1852.

2. That this right is not taken away by congress declaring the bridge to be a "lawful structure," because congress has no judicial authority to review or reverse the judgment of the supreme court, and such declaration is not within the scope of the legislative authority of congress.

3. It is not taken away by the bridge being "established as a post-road," because under the power to establish post-roads, congress has no authority to construct or maintain a road within a State to the injury of private property or individual right.

4. It is not taken away by the requirements of the act imposing on vessels the duty "not to interfere with the construction and elevation of the bridge," because those requirements are imposed for an object not intrusted to the general government, nor in execution of its commercial power; and they operate to tax the exports of a State, and give a preference by a regulation of commerce to the ports of one State, over the ports of another.

5. It could not be taken away by any power of congress without just compensation, and none is rendered.

6. It was the duty of the defendants to obey the command of the court, by removing or altering their bridge as required by the decree; and for their disobedience, they are in contempt, and they are in further contempt by rebuilding the bridge in defiance of the decree, and of the injunction issued on the 27th of June, 1854, and should be dealt with accordingly by sequestration and attachment.

7. The decree of the court remains now in force, and the complainant is entitled to have it executed by writ of assistance and

to have process to compel the payment of the costs awarded by the decree.

The counsel for the defendants made the following points, viz:

I. On the motion to dissolve the injunction.

1. The injunction was awarded without "reasonable notice of the time and place" of the application. Act of March 2, 1793, § 5.

2. It was awarded by a judge of a different circuit from that in which it was to operate. Laws U. S. Courts, p. 34, note.

3. It was awarded without requiring bond and security to indemnify the defendant.

4. It was awarded on a bill filed either to carry on the proceedings in a pending suit, or to carry into effect a decree made in a former suit; and this bill does not lie, nor is it in proper form for either purpose. Story's Eq. Plead. § 352, 429; Adams v. Dowdings, 2 Madd, 53.

5. Congress has legalized the Wheeling Bridge; act of August 31, 1852; and had constitutional power to legalize it. See the opinions formerly delivered in the Wheeling·Bridge case. The act may be sustained under the power to regulate commerce; Gibbons v. Ogden, 9 Wheat. 1; United States v. Coombs, 12 Pet. 72, (op. 78); or under the power to established post-roads; or under both powers. And this, notwithstanding the compact between Virginia and Kentucky; Pollard's Lessee v. Hagam, 3 How. 212, (op. 229, 230;) The Society for propagating the Gospel v. Wheeler, 2 Gallis, C. C. R. 138; Evans v. Easton, 1 Pet. C. C. R. 322. But that compact does not apply.

6. A motion was offered to make absolute the decree in said bill mentioned, and was dismissed by this court for want of prosecution on the 15th day of December, 1853.

II. Against the motion for the writ of assistance.

The same authorities as above and hereafter cited.

III. Against motions for attachment and sequestration.

1. The evidence offered, does not show that the parties have been guilty of contempt.

2. The injunction was, and is a nullity, because awarded without notice, without requiring bond, and by a judge having no jurisdiction.

3. The injunction was not regularly issued, or served by proper officers.

4. The injunction did not point out the duties it required of the defendants with adequate certainty. In effect it commanded the defendants to observe the requirements of a decree which "required" nothing such as the order of injunction vaguely

seemed to assume that it did acquire. That decree was on its face interlocutory and left open the questions which the injunction may assume to have been decided. Birchett *v.* Bollings, 5 Munf. 442.

5. The court has no power to inflict summary punishment for disobedience to any mere order of a judge at chambers. Such disobedience can only be punished, if at all, by indictment. Act of 1831, c. 99, 4 Stats. at Large, 487.

M. Justice NELSON delivered the opinion of the court.

The motion in this case is founded upon a bill filed to carry into execution a decree of the court, rendered against the defendants at the adjourned term in May, 1852, which decree declared the bridge errected by them across the Ohio River, between Wheeling and Zane's Island, to be an obstruction of the free navigation of the said river, and thereby occasioned a special damage to the plaintiff, for which there was not an adequate remedy at law, and directed that the obstruction be removed, either by elevating the bridge to a height designated, or by abatement.

Since the rendition of this decree, and on the 31st August, 1852, an act of congress has been passed as follows : " That the bridges across the Ohio River at Wheeling, in the State of Virginia, and at Bridgeport, in the State of Ohio, abutting on Zane's Island, in said river, are hereby declared to be lawful structures in their present positions and elevations, and shall be so held and taken to be, any thing in the law or laws of the United States to the contrary notwithstanding.

And further : " That the said bridges be declared to be and are established post-roads for the passage of the mails of the United States, and that the Wheeling and Belmont Bridge Company are authorized to have and maintain their bridges at their present site and elevation ; and the officers and crews of all vessels and boats navigating said river are required to regulate the use of their said vessels, and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation and construction of said bridges."

The defendants rely upon this act of congress as furnishing authority for the continuance of the bridge as constructed, and as superseding the effect and operation of the decree of the court previously rendered, declaring it an obstruction to the navigation.

On the part of the plaintiff, it is insisted that the act is unconstitutional and void, which raises the principal question in the case.

In order to a proper understanding of this question it is ma-

terial to recur to the ground and principles upon which the majority of the court proceeded in rendering the decree now sought to be enforced.

The bridge had been constructed under an act of the legislature of the State of Virginia; and it was admitted that act conferred full authority upon the defendants for the erection, subject only to the power of congress in the regulation of commerce. It was claimed, however, that congress had acted upon the subject and had regulated the navigation of the Ohio River, and had thereby secured to the public, by virtue of its authority, the free and unobstructed use of the same; and that the erection of the bridge, so far as it interfered with the enjoyment of this use, was inconsistent with and in violation of the acts of congress, and destructive of the right derived under them; and that, to the extent of this interference with the free navigation of the river, the act of the legislature of Virginia afforded no authority or justification. It was in conflict with the acts of congress, which were the paramount law.

This being the view of the case taken by a majority of the court, they found no difficulty in arriving at the conclusion, that the obstruction of the navigation of the river, by the bridge, was a violation of the right secured to the public by the constitution and laws of congress, nor in applying the appropriate remedy in behalf of the plaintiff. The ground and principles upon which the court proceeded will be found reported in 13 How. 518.

Since, however, the rendition of this decree, the acts of congress, already referred to, have been passed, by which the bridge is made a post-road for the passage of the mails of the United States, and the defendants are authorized to have and maintain it at its present site and elevation, and requiring all persons navigating the river to regulate such navigation so as not to interfere with it.

So far, therefore, as this bridge created an obstruction to the free navigation of the river, in view of the previous acts of congress, they are to be regarded as modified by this subsequent legislation; and, although it still may be an obstruction in fact, is not so in the contemplation of law. We have already said, and the principle is undoubted, that the act of the legislature of Virginia conferred full authority to erect and maintain the bridge, subject to the exercise of the power of congress to regulate the navigation of the river. That body having in the exercise of this power, regulated the navigation consistent with its preservation and continuation, the authority to maintain it would seem to be complete. That authority combines the concurrent powers of both governments, state and federal, which, if not sufficient, certainly none can be found in our system of government.

We do not enter upon the question, whether or not congress possess the power, under the authority in the constitution, "to establish post-offices and post-roads," to legalize this bridge; for, conceding that no such powers can be derived from this clause, it must be admitted that it is, at least, necessarily included in the power conferred to regulate commerce among the several States. The regulation of commerce includes intercourse and navigation; and, of course, the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation; and that power, as we have seen, has been exercised consistent with the continuance of the bridge.

But it is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby in favor of the plaintiff. This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed int· judgment the right becomes absolute, and it is the duty of the court to enforce it.

The case before us, however, is distinguishable from this class of cases, so far as it respects that portion of the decree directing the abatement of the bridge. Its interference with the free navigation of the river constituted an obstruction of a public right secured by acts of congress.

But, although this right of navigation be a public right common to all, yet, a private party sustaining special damage by the obstruction may, as has been held in this case, maintain an action at law against the party creating it, to recover his damages; or, to prevent irreparable injury, file a bill in chancery for the purpose of removing the obstruction. In both cases, the private right to damages, or to the removal, arises out of the unlawful interference with the enjoyment of the public right, which, as we have seen, is under the regulation of congress. Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respect the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But that part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time,

since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with law, no more than there would be where the plaintiff himself had consented to it, after the rendition of the decree. Suppose the decree had been executed, and after that the passage of the law in question, can it be doubted but that the defendants would have had a right to reconstruct it? And is it not equally clear that the right to maintain it, if not abated, existed from the moment of the enactment?

A class of cases that have frequently occurred in the state courts contain principles analogous to those involved in the present case. The purely internal streams of a State which are navigable belong to the riparian owners to the thread of the stream, and, as such, they have a right to use the waters and bed beneath, for their own private emolument, subject only to the public right of navigation. They may construct wharves or dams or canals for the purpose of subjecting the stream to the various uses to which it may be applied, subject to this public easement. But, if these structures materially interfere with the public right, the obstruction may be removed or abated as a public nuisance.

In respect to these purely internal streams of a State, the public right of navigation is exclusively under the control and regulation of the state legislature; and in cases where these erections or obstructions to the navigation are constructed under a law of the State, or sanctioned by legislative authority, they are neither a public nuisance subject to abatement, nor is the individual who may have sustained special damage from their interference with the public use entitled to any remedy for his loss. So far as the public use of the stream is concerned, the legislature having the power to control and regulate it, the statute authorizing the structure, though it may be a real impediment to the navigation, makes it lawful. 5 Wend. 448, 449; 15 Ib. 113; 17 T. R. 195; 20 Ib. 90, 101; 5 Cow. 165.

It is also urged that this act of congress is void, for the reason that it is inconsistent with the compact between the States of Virginia and Kentucky, at the time of the admission of the latter into the Union, by which it was agreed, "that the use and navigation of the River Ohio, so far as the territory of the proposed, or the territory that shall remain within the limits of this commonwealth, lies thereon, shall be free and common to the citizens of the United States," and which compact was assented to by congress at the time of the admission of the State.

This court held, in the case of Green et al. *v.* Biddle, 2 Wheat.

1, that an act of the legislature of Kentucky in contravention of the compact was null and void, within the provision of the constitution forbidding a State to pass any law impairing the obligation of contracts. But that is not the question here. The question here is, whether or not the compact can operate as a restriction upon the power of congress under the constitution to regulate commerce among the several States? Clearly not. Otherwise congress and two States would possess the power to modify and alter the constitution itself.

This is so plain that it is unnecessary to pursue the argument further. But we may refer to the case of Wilson *v.* Mason, 1 Cranch, 88, 92, where it was held that this compact, which stipulated that rights acquired under the commonwealth of Virginia shall be decided according to the then existing laws, could not deprive congress of the power to regulate the appellate jurisdiction of this court, and prevent a review where none was given in the state law existing at the time of the compact. Again, it is insisted that the act of congress is void, as being inconsistent with the clause in the ninth section of article first of the constitution, which declares that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another."

It is urged that the interruption of the navigation of the steamboats engaged in commerce and conveyance of passengers upon the Ohio River at Wheeling from the erection of the bridge, and the delay and expense arising therefrom, virtually operate to give a preference to this port over that of Pittsburg; that the vessels to and from Pittsburg navigating the Ohio and Mississippi rivers are not only subjected to this delay and expense in the course of the voyage, but that the obstruction will necessarily have the effect to stop the trade and business at Wheeling, or divert the same in some other direction or channel of commerce. Conceding all this to be true, a majority of the court are of opinion that the act of congress is not inconsistent with the clause of the constitution referred to—in other words, that is not giving a preference to the ports of one State over those of another, within the true meaning of that provision. There are many acts of congress passed in the exercise of this power to regulate commerce, providing for a special advantage to the port or ports of one State, and which very advantge may incidentally operate to the prejudice of the ports in a neighboring State, which have never been supposed to conflict with this limitation upon its power. The improvement of rivers and harbors, the erection of light-houses, and other facilities of commerce, may be referred to as examples. It will not do to say that the exercise of an

admitted power of congress conferred by the constitution is to be withheld, if it appears, or can be shown, that the effect and operation of the law may incidentally extend beyond the limitation of the power. Upon any such interpretation, the principal object of the framers of the instrument in conferring the power would be sacrificed to the subordinate consequences resulting from its exercise. These consequences and incidents are very proper considerations to be urged upon congress for the purpose of dissuading that body from its exercise, but afford no ground for denying the power itself, or the right to exercise it.

The court are also of opinion that, according to the true exposition of this prohibition upon the power of congress, the law in question cannot be regarded as in conflict with it.

The propositions originally introduced into the convention, from which this clause in the constitution was derived, declared that congress shall not have power to compel vessels belonging to citizens or foreigners to enter or pay duties or imposts in any other State than that to which they were bound, nor to clear from any other than that in which their cargoes were laden. Nor shall any privilege or immunity be granted to any vessels on entering or clearing out, or paying duties or imposts, in one State in preference to another. Also, that congress shall not have power to fix or establish the particular ports for collecting the duties or imposts in any State, unless the State should neglect to fix them upon notice. I give merely the substance of the several propositions.

Luther Martin, in his letter to the legislature of Maryland, says that these propositions were introduced into the convention by the Maryland delegation; and that without them, he observes, it would have been in the power of congress to compel ships sailing in or out of the Chesapeake to clear or enter at Norfolk, or some port in Virginia—a regulation that would be injurious to the commerce of Maryland. It appears also, from the reports of the convention, that several of the delegates from that State expressed apprehensions that under the power to regulate commerce congress might favor ports of particular States, by requiring vessels destined to other States to enter and clear at the ports of the favored ones, as a vessel bound for Baltimore to enter and clear at Norfolk.

These several propositions finally took the form of the clause in question, namely: "No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter or clear or pay duties in another." 1 Elliot's Deb. 266, 270, 279, 280, 311, 375; 5 Ib. 478, 483, 502, 545.

The power to establish their ports of entry and clearance by

the States was given up, and left to congress. But the rights of the States were secured, by the exemption of vessels from the necessity of entering or paying duties in the ports of any State other than that to which they were bound, or to obtain a clearance from any port other than at the home port, or that from which they sailed. And, also, by the provision that no preference should be given, by any regulation of commerce or revenue, to the ports of one State over those of another. So far as the regulation of revenue is concerned, the prohibition in the clause does not seem to have been very important, as, in a previous section, (8,) it was declared, that " all duties, imposts, and excises, shall be uniform throughout the United States ;" and, as to a preference by a regulation of commerce, the history of the provision, as well as its language, looks to a prohibition against granting privileges or immunities to vessels entering or clearing from the ports of one State over those of another. That these privileges and immunities, whatever they may be in the judgment of congress, shall be common and equal in all the ports of the several States. Thus much is undoubtedly embraced in the prohibition; and it may, certainly, also embrace any other description of legislation looking to a direct privilege or preference of the ports of any particular State over those of another. Indeed, the clause, in terms, seems to import a prohibition against some positive legislation by congress to this effect, and not against any incidental advantages that might possibly result from the legislation of congress upon other subjects connected with commerce, and confessedly within its power.

Besides, it is a mistake to assume that congress is forbidden to give a preference to a port in one State over a port in another. Such preference is given in every instance where it makes a port in one State a port of entry, and refuses to make another port in another State a port of entry. No greater preference, in one sense, can be more directly given than in this way; and yet, the power of congress to give such preference has never been questioned. Nor can it be without asserting that the moment congress makes a port in one State a port of entry, it is bound, at the same time, to make all other ports in all other States ports of entry. The truth seems to be, that what is forbidden is, not discrimination between individual ports within the same or different States; but discrimination between States; and if so, in order to bring this case within the prohibition, it is necessary to show, not merely discrimination between Pittsburg and Wheeling, but discrimination between the ports of Virginia and those of Pennsylvania.

Upon the whole, without pursuing the examination further, our conclusion is, that, so far as respects that portion of the decree which directs the alteration or abatement of the bridge, it

cannot be carried into execution since the act of congress which regulates the navigation of the Ohio River, consistent with the existence and continuance of the bridge; and that this part of the motion, in behalf of the plaintiff, must be denied. But that, so far as respects that portion of the decree which directs the costs to be paid by the defendants, the motion must be granted.

A motion has also been made, on behalf of the plaintiff, for attachments against the president of the Bridge Company and others, for disobedience of an injunction issued by Mr. Justice Grier, in vacation, on the 27th June, 1854.

It appears that since the rendition of the decree of this court and the passage of the act of congress, and before any proceedings taken to enforce the execution of the decree, notwithstanding this act, the bridge was broken down, in a gale of wind, leaving only some of the cables suspended from the towers across the river. Upon the happening of this event, a bill was filed by the plaintiff, and an application for the injunction above mentioned was made, which was granted, enjoining the defendants, their officers and agents, against a reconstruction of the bridge, unless in conformity with the requirements of the previous decree in the case. The object of the injunction was to suspend the work, together with the great expenses attending it, until the determination of the question by this court as to the force and effect of the act of congress, in respect to the execution of the decree. The defendants did not appear upon the notice given of the motion for the injunction, and it was, consequently, granted without opposition.

After the writ was served, it was disobeyed, the defendants proceeding in the reconstruction of the bridge, which they had already begun before the issuing or service of the process.

A motion is now made for attachments against the persons mentioned for this disobedience and contempt.

A majority of the court are of opinion, inasmuch as we have arrived at the conclusion that the act of congress afforded full authority to the defendants to reconstruct the bridge, and the decree directing its alteration or abatement could not, therefore, be carried into execution after the enactment of this law, and inasmuch as the granting of an attachment for the disobedience is a question resting in the discretion of the court, that, under all the circumstances of the case, the motion should be denied.

Some of the judges also entertain doubts as to the regularity of the proceedings in pursuance of which the injunction was issued.

Mr. Justice WAYNE, Mr. Justice GRIER, and Mr. Justice CURTIS, are of opinion that, upon the case presented, the attachment for contempt should issue, and in which opinion I concur.

State of Pennsylvania *v.* Wheeling and Belmont Bridge Co.

The motion for the attachment is denied, and the injunction dissolved.

Mr. Justice McLEAN, dissenting.

A motion was made, at the last term, for process of contempt against the bridge company, for not complying with the decree of this court to elevate or abate the suspension bridge, or open a draw in the bridge over the western branch of the Ohio, so as to afford a safe channel for steamboats when the water is too high for them to pass under the suspension bridge; and also for not obeying the injunction granted, &c.

In opposition to this motion the act of congress of the 31st of August, 1852, is set up, which purports to legalize both bridges.

The 6th section of the above act provides " that the bridges across the Ohio River at Wheeling, in the State of Virginia, and at Bridgeport, in the State of Ohio, abutting on Zane's Island, in said river, are hereby declared to be lawful structures, in their present position and elevation, and shall be so held and taken to be, any thing in any law or laws of the United States to the contrary notwithstanding."

7th section. "And be it further enacted, that the said bridges are declared to be and are established post-roads for the passage of the mails of the United States, and that the Wheeling and Belmont Bridge Company are authorized to have and maintain their said bridges at their present site and elevation; and the officers and crews of all vessels and boats navigating said river are required to regulate the use of their said vessels and boats, and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation and construction of said bridges."

This court, in the exercise of its judicial functions, with the approbation of seven of its members, which included all the judges present, with but one exception, took jurisdiction of a complaint made by the State of Pennsylvania against the Wheeling Bridge Company, which was charged with having constructed its bridge so low as to cause a material obstruction to the commerce of the Ohio River; and which was especially injurious to the State of Pennsylvania, which had expended several millions of dollars in the construction of lines of improvement from Philadelphia to Pittsburg—such as turnpike roads, railroads, canals, and slackwater navigation—over which more than fifty millions' worth of property were transported annually, in connection with the Ohio River; and that any material obstruction to the navigation of the river by the bridge would be injurious to that State, by lessening the transportation of passengers and freight on the above lines.

After a very tedious and minute investigation of the facts of

the case, which embraced the reports of practical engineers, depositions from the most experienced river men, statements of the stages of water in the river throughout the year, and also after a full consideration of the legal principles applicable to the matter in controversy, six of the members of this tribunal, two only dissenting, were brought to the conclusion that the bridge was a material obstruction to the navigation of the river, at seasons of the year and under circumstances which rendered its navigation most important to the public and to the complainant, and that there was no adequate remedy for it by an action at common law.

From the facts developed in the course of the investigation, it appeared that the seven passenger packets, which plied between Cincinnati and Pittsburg, whose progress was obstructed by the bridge, conveyed about one half of the goods, in value, which were transported on the river, and three fourths of the passengers between the above cities. That each packet transported annually thirty thousand nine hundred and sixty tons of freight, and twelve thousand passengers.

It appeared that a steamboat drawing five feet water, and whose chimneys were seventy-nine feet six inches high, could never pass under the apex of the bridge, at any stage of the water, without lowering its chimneys. And the court found by lowering the chimneys, including the expense of machinery, and delay of time, without an estimate as to the dangers incurred by the operation, that a tax was imposed upon the seven packets, annually, of $5,598.00, which sum was exacted from the owners, for the accommodation of the crossing public and the bridge proprietors.

The court also found that the cost of each packet, per running hour, was eight dollars and thirty-three cents; and, as was estimated, if the chimney should be made shorter, so as to pass under the bridge at an ordinary stage of water, it would cause the average loss of four hours in each trip between Cincinnati and Pittsburg, which would amount to the sum of thirty-three dollars and thirty-two cents, which, being multiplied by sixty, the average number of trips each season, would amount to the sum of $1,999.20; and this, being multiplied by seven, would make the sum of $13,994.40, which would be an annual loss by the owners of these packets.

The court also found, that from the great weight of the chimneys of the packets, and other boats of that class, they could not be lowered by hinges at the tops; that they could only be let down at the hurricane deck by means of a derrick. The average weight of the chimneys, which must be lowered upon each of the large boats, was about four tons; and if this enor-

mous weight, hanging over the cabin, or rather over the berths of the passengers, in the process of lowering, should come down by the run, their weight would crush the hurricane deck, break through the berths of the cabin, and be arrested, probably, only by the cargo or the lower flooring of the vessel.

For these reasons, and others contained in the opinion of the court, they came to the decision that the bridge obstructed the navigation of the Ohio, and to the irremediable injury at law of the public works of Pennsylvania. But, to avoid any greater hardship on the bridge owners than would be required by the maintenance of the commercial right, this court decreed that if the defendant would open a draw in the western channel which would admit the passage of boats, when, from the high water, they could not pass under the suspension bridge, that it would remove all reasonable ground of complaint by the plaintiffs. But this it refused to do, and invoked the legislation of congress successfully, in procuring the passage of the act above cited.

That congress have a constitutional power to regulate commerce among the States, as with foreign nations, must be admitted. And where the constitution imposes no restriction on this power, it is exercised at discretion; and the correction of impolicy, or abuse, is only through the ballot-box. During the existence of the embargo, in the year 1808, it was contended that, under the commercial power, an embargo could not be imposed, as it destroyed commerce. But it was held otherwise; so that the constitutionality of a regulation of commerce by congress does not depend upon the policy and justice of such an act, but generally upon its discretion.

An embargo is a temporary regulation, and is designed for the protection of commerce, though, for a time, it may suspend it. There are, however, limitations on the exercise of the commercial power by congress. As stated in the opinion of the court, congress had regulated the commerce of the Ohio River. But all such regulations, before the passage of the above act, were of a general character, and tended to the security of transportation, whether of freight or passengers.

The decree in the Wheeling bridge case was the result of a judicial investigation, founded upon facts ascertained in the course of the hearing. It was strictly a judicial question. The complaint was an obstruction of commerce, by the bridge, to the injury of the complainant, and the court found the fact to be as alleged in the bill. It was said by Chief Justice Marshall, many years ago, that congress could do many things, but that it could not alter a fact. This it has attempted to do in the above act. An obstruction to the navigation of the river was, technically, a nuisance, and, in their decree, this court so pronounced.

The compact between Virginia and Kentucky, which "declared, that the use and navigation of the River Ohio should be free and common to the citizens of the United States," was incorporated into the Kentucky constitution of 1791, and received the sanction of congress in the admission of that State into the Union. This compact bound both parties; and this court held, that a violation of it by a law of Kentucky, called the occupying claimant law, was void, as it impaired the obligation of the compact. Virginia, no more than Kentucky, could violate any of its provisions, although they extended to citizens of the Union.

The effect that the act of congress shall have upon the decree of the court, I will now consider. This subject can be treated only with the profoundest respect for the legislative action of the nation, and with a sincere desire to give to it all the effect which such an expression should have.

The congress and the court constitute coördinate branches of the government; their duties are distinct and of a different character. The judicial power cannot legislate, nor can the legislative power act judicially. The constitution has declared, that the judicial power shall extend to all cases in law and equity arising under the constitution, the laws of the United States, and treaties, &c. All legislative powers are vested in congress. While these functionaries are limited to their appropriate duties as vested, there can be little or no conflict of jurisdiction.

From the organization of the legislative power, it is unfitted for the discharge of judicial duties; and the same may be said of this court in regard to legislation. It may therefore happen, that, when either trenches upon the appropriate powers of the other, their acts are inoperative and void.

The judicial power is exercised in the decision of cases; the legislative, in making general regulations by the enactment of laws. The latter acts from considerations of public policy; the former by the pleadings and evidence in a case. From this view it is at once seen, that congress could not undertake to hear the complaint of Pennsylvania in this case, take testimony or cause it to be taken, examine the surveys and reports of engineers, decide the questions of law which arise on the admission of the testimony, and give the proper and legal effect to the evidence in the final decree. To do this is the appropriate duty of the judicial power. And this is what was done by this court, before the above act of congress was passed. The court held, that the bridge obstructed the navigation of the Ohio River, and that, consequently, it was a nuisance. The act declared the bridge to be a legal structure, and, consequently, that it was not a nuisance. Now, is this a legislative or a judicial act? Whether

it be a nuisance or not, depends upon the fact of obstruction; and this would seem to be strictly a judicial question, to be decided on evidence produced by the parties in a case.

We do not speak of a public commercial right, but of an obstruction to it, by which an individual wrong is done, that at law is irremediable. A regulation of the public right belongs exclusively to congress. It is a question of policy, which seldom, if ever, comes within the range of judicial action. All such questions belong to the legislative power.

The words of the seventh section of the act are, " that the said bridges are declared to be and are established post-roads for the passage of the mails of the United States; and that the Wheeling and Belmont Bridge Company are authorized to have and maintain their said bridges, at their present site and elevation; and the officers and crews of all vessels and boats navigating the river are required to regulate the use of their said vessels and boats, and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation and construction of said bridges."

The provisions of this section are: 1. The bridges are declared to be post-roads; and, 2. The pipes and chimneys of the boats are required to be cut down, so as not to interfere with said bridges.

And, first, as to the effect of making the bridges post-roads:—

By the act of the 7th July, 1838, all railroads are declared to be post-roads; and, for more than twenty years, all navigable waters on which steamboats regularly ply are established as post-roads.

The policy of extending the lines of post-roads on all railroads and navigable waters was to require, under a penalty, all boats and railroad cars to deposit in post-offices all letters which they may carry, so that the postage may be charged. It gives to the government no rights on these lines of communication, except where the mail may be carried under a contract, which, if obstructed, subjects the offender to prosecution. It gives to the government no other interest in or control over the road.

The railroad may be changed at the will of the proprietors, and the mail will not be carried in the cars, except by contract, for which a compensation is paid. The same principle applies to a turnpike road on which the mail is carried. Even an ordinary road, though a post-road, may be altered or vacated at the will of the local authority.

It is difficult to perceive what benefit can result to the public from these bridges being declared a post-road. It cannot use the bridges without paying toll the same as for the use of a turnpike road or railroad. It does not prevent the Bridge Com-

pany from pulling down the bridge or altering it in any respect. They are under no obligation by reason of this use to keep up the bridge or repair it. They may abandon it, and if it should be again prostrated by the winds, they are not obliged to rebuild it.

The idea that making the bridge a post-road would exempt it from the consequence of being a nuisance, is wholly unsustainable. Should the contractor to carry the mail refuse or neglect to pay the customary tolls, he would be liable to a suit for the amount. If one of the Pittsburg packets carry the mail under a contract with the post-office department, and the bridge should obstruct the boat, such an obstruction would make the bridge company liable, unless the above act, which gives a preference to the crossing mail, applies a different rule to the mail boat, and it would seem that no such preference can arise under the law declaring the bridge to be a post-road.

But is there a power in congress to legalize a bridge over a navigable water within the jurisdiction of any State or States? It has the power to regulate commerce among the several States, requiring two or more States to authorize the regulation. But this does not necessarily include the power to construct bridges which may obstruct commerce, but can never increase its facilities on a navigable water. Any power which congress may have in regard to such a structure is indirect, and results from a commercial regulation. It may, under this power, declare that no bridge shall be built which shall be an obstruction to the use of a navigable water. And this, it would seem, is as far as the commercial power by congress can be exercised.

The same power that would enable congress to build a bridge over a navigable stream would authorize it to construct a railroad or turnpike road through the States of the Union, as it might deem expedient. This power may have been asserted in regard to post-roads, but the settled opinion now seems to be, that to establish post-roads within the meaning of the constitution is to designate them. In this sense congress may establish post-roads extending over bridges, but it can neither build them nor exercise any control over them, except the mere use for the conveyance of the mail on paying toll.

It has often been held, that in throwing a bridge across a navigable river or arm of a lake, or the sea, the sovereign power of the State in some form may authorize it, under such restrictions and conditions as may be considered best for the public. But this power must always be so exercised as not materially to obstruct navigation. Over this public right congress exercises exclusive legislation, except where the constitution restricts it; and the judicial power can never interpose, except in regard to

private injuries. It would be otherwise if congress should authorize an indictment for obstructing the public right of navigation on the Ohio, or generally. If, under the commercial power, congress may make bridges over navigable waters, it would be difficult to find any limitation of such a power. Turnpike roads, railroads, and canals might on the same principle be built by congress. And if this be a constitutional power, it cannot be restricted or interfered with by any state regulation So extravagant and absorbing a federal power as this has rarely, if ever, been claimed by any one. It would, in a great degree, supersede the state governments by the tremendous authority and patronage it would exercise. But if the power be found in the constitution, no principle is perceived by which it can be practically restricted. This dilemma leads us to the conclusion that it is not a constitutional power. Having arrived at this point, it only remains to say, that the act of congress declaring the bridge to be a legal structure, being the exercise of a judicial and an appellate power, is unconstitutional, and consequently inoperative. It is what it purports to be, a reversal of the decree of this court, in effect, if not in terms.

Under the commercial power, congress may declare what shall constitute an obstruction of commerce, on a navigable water; and so far as the public right is concerned, there is no limitation to the exercise of this power, unless it be found in the constitution.

It must be admitted that the provision in the 7th section in regard to the length of the pipes and chimneys of the boats which ply on the Ohio from and to Pittsburg, is a commercial regulation. Congress have required the boilers of steamboats to be inspected, and that an iron chain should be used as a tiller-rope on all steamboats, and this has been required with a view to the safety of the boat, its passengers and cargo. In the event of fire the rope is generally burnt, and the boat becomes unmanageable. This is as far as congress has legislated, in regard to the tackle of the boat. No attempt has before been made to regulate the height of the chimneys.

From facts above stated, it appears the speed of the seven packets, by cutting down the chimney, would be reduced four hours, on an average, each, on a trip between Pittsburg and Cincinnati. This, as the statement shows, would increase the expense of the owners of the seven packets, in addition to the loss of time, $13,994.40 per annum. Such a regulation would seem to be the more objectionable, as the loss arises from the preference given to the bridge, which the public accommodation does not require.

But there is another objection, of a more serious nature. In

the 9th section of the 2d article of the constitution, it is declared "that no preference shall be given, by any regulation of commerce or revenue, to the ports of one State over those of another." This can have no relation to "duties and imposts," as, in the 8th section, it is declared "they shall be uniform throughout the United States." The clause must refer to some other regulation, and it applies, of course, to all regulations affecting commerce.

It was said in the late argument of this case, that the Pittsburg packets had done a larger business in transportation the last year, than within the same time at any former period. If this be so, the injury by cutting down the chimneys of all the boats to and from Pittsburg must amount to a larger sum than above stated. Nothing could more forcibly illustrate the propriety of the above provision in the constitution, that no port in one State shall have a preference over those of another.

Practical knowledge in regard to steamboat and railroad transportation of freight is better than theory. Notwithstanding the lines of railroad from Pittsburg to Cincinnati, and to St. Louis, by the way of Chicago, for the past year have been in operation, the business on the steamboat lines has greatly increased in freight; and from published prices it would seem that the water transportation is three times cheaper than the railroad, and, on account of the frequent detention of freight cars, is much more expeditious.

But it is said many regulations of commerce, from local circumstances, cannot operate equally on all ports. As, for instance, a breakwater may be more beneficial to one port than another; and the same inequality may exist from the establishment of light-houses and the improvement of harbors. But these are incidental and not direct consequences, resulting from the exercise of the legislative power, and no prudence can, effectually, guard against them. As near as may be, equal facilities should be given to ports of equal importance; this, however, is a matter for the decision of congress, and does not belong to the judiciary. But where a prohibition is imposed on congress in the exercise of the commercial power, and it is not regarded, it is a judicial question, and this is the only check to be relied on against such unconstitutional legislation.

It is objected that the court cannot determine what degree of preference shall be given to one port over another, to make the regulation come within the prohibition. If this be so, then is the constitutional prohibition a dead letter; but this is not the practical view which this court have uniformly taken of the constitution. The restrictions on state powers stand upon the same footing, and no insuperable difficulty has been found in giving effect to them.

"No State shall coin money; emit bills of credit; make any thing but gold and silver coin a tender in payments of debts; pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." To determine the unconstitutionality of a law under some of these prohibitions would. be attended with as much, if not more, difficulty than to say whether a commercial regulation gives a preference to one port over another.

In the case of McCulloch v. The State of Maryland, 4 Wheat. 431, the court say, "that the power to tax 'the Bank of the United States' involves the power to destroy," and on this ground the tax on the bank by the legislature of Maryland was declared to be unconstitutional and void. If this rule be applied to the point under consideration, no doubt could exist. Congress are prohibited from giving a preference to one port over another in different States, and consequently, if any such preference be given, the regulation is void. Not an incidental preference, but a regulation which necessarily acts injuriously and oppressively on one to the exclusion of other ports.

Suppose congress had declared by law that all steamboats plying to and from Pittsburg should not use chimneys more than forty feet high, which would essentially retard their progress, and consequently injure their business, would any court hesitate to pronounce such a regulation unconstitutional, as giving a preference to all other ports on the river over that of Pittsburg. This congress has in effect done, and the only justification for it must be found, if any exist, in the regulated height of the bridge. But the bridge, at a very small expense comparatively, could have been elevated as our decree required, and as the charter under which it was built also required. Less than this: if a draw had been made in the bridge over the western channel, so as to enable boats to pass up and down the river when they could not pass under the suspension bridge, nothing more was required. The expense of the draw, it is believed, would not exceed twenty-five thousand dollars—a sum less, as it would seem, than the annual injury inflicted on the commerce of Pittsburg by the bridge.

If the regulation of the chimneys of steamboats, as in the law to protect the bridge, would be unconstitutional without the bridge, it is not perceived how the bridge could make it constitutional. The right to cross the river by a bridge, and to navigate it, is admitted; but these public rights are not incompatible. They can both be enjoyed without any material interference of the one with the other. This being the case, congress, it would seem, cannot restrict the right to navigate the river for the benefit of the bridge. It cannot violate the constitutional inhibition

in giving a preference to other ports over that of Pittsburg, by declaring the Wheeling bridge formed no obstruction to navigation. The constitution declares congress shall not give a preference to one part over another; the act, if done, is not constitutional, though done under the power to regulate commerce.

The equality which such a regulation was intended to secure is a matter intimately connected with the commercial prosperity of the country. For a wrong thus done by congress there is no remedy, except through the exercise of the judicial power. This court is sworn to support the constitution, and in every infraction of that instrument by congress or state legislatures, where individual injury is inflicted, redress may be obtained by action in court. Congress is prohibited from laying a duty on exports, except for port charges. Can a duty be imposed on exports beyond this under the commercial power? The commercial power is limited in this and in other cases, and if the limit be exceeded the act is void. The federal government in all its forms exercises enumerated and limited powers. But if the limitation depends upon the discretion of congress, there is neither limitation nor protection. This is neither the theory nor the practical operation of the government. Congress has power to regulate commerce, but it has no power in such regulation to give a preference to one port in a State over another port in a different State. If it may do this to an extent materially injurious, it may equally disregard every other restriction in the constitution. The regulation of the height of the chimneys of steamboats which ply to and from Pittsburg, by the present elevation of the bridge, is the same in effect and in principle as if the act had required such steamers to cut down their chimneys without reference to the bridge. The bridge affords no justification or excuse for an unconstitutional regulation.

But it is said there is great difficulty in ascertaining the fact, that a regulation gives a preference to one or more ports in a State over those of another, and it is intimated that a jury should be called to ascertain the fact. This argument was used in regard to the fact of obstruction, complained of by Pennsylvania; but this court very properly determined that a court of chancery, having jurisdiction, could inquire whether the bridge constituted such an obstruction to commerce as materially to injure the public works of Pennsylvania, and on such a finding by this court the late decree was entered for the removal of the obstruction.

What fact beyond this is necessary to determine the fact of preference of one port over another? The chimneys of the steamboats which ply to and from Pittsburg are required to be

cut down, so as to pass under the bridge. By this the rights of the port of Pittsburg are measured by the Wheeling bridge, and that bridge, this court have held, is so material an obstruction to commerce as to be a nuisance to the State of Pennsylvania.

This obstruction or nuisance consists in the necessity, when a boat passes under the bridge, of lowering its chimneys or cutting them down, so as to pass under it; and if this be a material injury to the commerce of the State of Pennsylvania, on its lines of improvement, how much greater the injury to the port of Pittsburg, from and to which one hundred millions' worth of property is transported annually? Can any one fail to see that the proof of preference to the port of Wheeling, and those below it, is given by the regulation complained of, over the port of Pittsburg and others above the bridge? The proof of this important fact, as found by the decision of the court already pronounced, is more conclusive to show the preference than to establish the claim of Pennsylvania.

Can it be urged that this preference is limited to a mere entry of the port? Had the Wheeling bridge been constructed over the Ohio River, a short distance below Pittsburg, it would have been far less injurious to that port than it now is; the boats, with their propelling power undiminished, could have approached near to that port, where their cargoes are discharged and received.

It is contended that the commerce across the river required the consideration of congress equally with that which floated upon its surface. There is no ground for such an argument. Some twenty-five or thirty thousand dollars, under the decree, would open a passage in the western channel so as to remove the obstruction. The annual injury to the commerce of the port of Pittsburg by the bridge is believed to exceed that sum.

Had the act of congress required all steamboats which ply upon the Ohio River to cut down their chimneys, so as to pass under the Wheeling bridge, the regulation, being general, however injurious, would not have given a preference to one port over another. It would have been the exercise of the commercial power, within the constitution.

The principle involved in this case is of the deepest interest to the commerce of the West. The Mississippi River and its tributaries water a country unsurpassed, if equalled, in the world, in extent and fertility. But if the obstruction of the Wheeling bridge may be repeated wherever the crossing public shall think proper to build a bridge, one third of the internal commerce of the Union will be materially obstructed. The injury of such a regulation would be very limited in the Atlantic

States, as there the rivers are short, and navigation is generally limited to the ebb and flow of the tide. If the Wheeling bridge be a legal structure, hundreds of bridges on the same principle may be thrown over the Mississippi and its navigable tributaries, to the great and remediless injury of western commerce.

That commerce is rapidly increasing, and at this time it probably amounts to four hundred millions of dollars annually; and if the Father of Waters and his tributaries shall have the same regulation extended to them as is now applied to the Wheeling bridge, it will impose a tax upon western commerce of several hundred thousand dollars annually; and this will be, not for the advancement of commerce over those waters, as it will greatly obstruct it, but to save a few thousand dollars in the structure of each bridge.

In regard to the motion for process of contempt against the bridge company, we must, I think, be governed by matters which appear upon the record. Shortly after the first decree was entered, the defendants made application to congress for relief. The object of the bridge company in making this application, was to counteract and annul the decision of this court. It is not supposed, however, that such was the intention of congress in passing the law. The two sections referred to were moved as an amendment to an act making appropriations for the service of the post-office department, on the 31st of August, 1852, at the close of that session. But little time was afforded for investigation of the important questions involved in the act. This fact is not stated to impair the force and effect of the act, but I think it is fit to be considered on this motion, in regard to the conduct of the bridge company.

The court may properly consider, if they are not bound to do so, that the defendants, in making application to congress, and in procuring the passage of the act, as having acted in good faith. And although the law, if it has been passed in violation of the constitution, cannot be held valid, yet it may save the defendants from the contempt charged. On its face, it gave to the bridge company all that it could desire or ask against the decree of this court. It legalized what the court held to be illegal; and it required all steamboats, running to and from Pittsburg, from any point below Wheeling, to regulate their chimneys so as to pass under the bridge. It was the exercise of a judicial power without an examination of the principles of law applicable, and without a knowledge of the facts on which the decree was founded. No imputation is cast upon that honorable body, but the fact must be known to every one that the senate and house of representatives, however distinguished for their high ability and legal learning, could not discharge, to the public advantage, the duties of an appellate court.

I have no doubt that the learned judge had power to grant the injunction. The 5th section of the act of the 2d of March, 1793, (1 Stats. at Large, 334,) declares " that writs of *ne exeat* and of injunction may be granted by any judge of the supreme court, in cases where they might be granted by the supreme or circuit court." The 14th section of the judiciary act of 1789 declares that " the courts of the United States shall have power to issue writs of *scire facias, habeas corpus,* and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law."

Six of my brethren now hold that the act of congress arrested the progress of the court in carrying their decree into effect, and gave the defendants a right to rebuild their bridge. The injunction prohibited them from reconstructing it; can the defendants be punished for contempt, for doing that which the law authorized? This view shows that the injunction ought not to have been granted, as it was against law. And is not this a sufficient excuse for the contempt charged? My view is, that the law was unconstitutional and void, and yet I consider it as excusing the defendants' contempt. I cannot punish defendants, by fine or imprisonment, for doing that which the law authorized them to do.

There was no opposition made when the injunction was applied for; and it was granted, as a matter of course, on the face of the bill. Had the act of congress been set up against the allowance of the injunction, the motion, in all probability, would have been referred to the supreme court by the judge.

Having come to the conclusion, for the reasons above stated, that the act of congress is inoperative and void, although it may excuse the contempt, it can afford no excuse for a further refusal to perform the decree. I would, therefore, order that the final decree, heretofore made, be carried into effect according to its true intent, by the first day of October next, and that the defendants pay the costs.

Mr. Justice GRIER.

I concur with the majority of this court, that in cases where this court has original jurisdiction, an interlocutory or preliminary injunction may be awarded, in vacation, by any judge of the court. I differ with the majority in declining to punish a wanton contempt of the process of the court.

I concur with my brother McLean, that congress cannot annul or vacate any decree of this court; that the assumption of such a power is without precedent, and, as a precedent for the future, it is of dangerous example.

38 *

Mr. Justice WAYNE.

I concur with Mr. Justices Nelson, Grier, and Curtis, in thinking that the attachment for contempt should have been granted by this court.

I concur with the majority of the court in the view taken by them of the liability of the defendants for the costs of this suit.

I dissent from the majority of the court in the opinion given, that the 6th and 7th sections of the act of the 31st August, 1852, (10 Stats. at Large, 112,) relieve the defendants from the operation of the judgment of this court in behalf of the plaintiff. That judgment was for the abatement of a nuisance of which the plaintiff complained. This court decided it was a nuisance, causing injury and great pecuniary loss, inasmuch as it prevented the State of Pennsylvania from navigating the Ohio River at all stages of its waters, to the uninterrupted navigation of which they had a right under the constitution of the United States. I know of no power in congress to interfere with such a judgment, under the pretence of a power to legalize the structure of bridges over the public navigable rivers of the United States, either within the States, or dividing States from each other, or under the commercial power of congress to regulate commerce among the States. Nor does the power of congress to establish post-offices and post-roads give any power to congress to do more between the States, or within the States, than to declare the routes for carrying the mails upon roads already existing, and to designate the localities upon those roads where post-offices shall be kept for the delivery and transmission of letters, and other things or parcels which congress may declare to be mailable. Whatever congress may have intended by the act of August, 1852, I do not think it admits of the interpretation given to it by the majority of the court; and if it does, then my opinion is that the act would be unconstitutional.

I concur with many of the views taken by Mr. Justice McLean in his dissenting opinion; but I shall take another opportunity to express my opinion fully upon the action of this court and of congress in this case.

Mr. Justice DANIEL.

In the decision of the court dissolving the injunction and refusing the coercive measures asked for in this case, I entirely concur. But as, in the argument by which the court have proceeded to their conclusions, important questions of constitutional law appear to me to have been, some of them, passed over without consideration, and others inaccurately expounded, convictions of duty impel me to express my own interpretation of those questions. The correctness or incorrectness of that inter-

State of Pennsylvania *v.* Wheeling and Belmont Bridge Co.

pretation is left to the judgment of those whom curiosity or interest may incline to its examination ; but whether examined, or approved, or condemned, or otherwise, it has been given because commanded by a sense of obligation, from obedience to which I hold that no one is or can be absolved.

When the controversy now revived before us was, in January, 1850, for the first time brought to our attention, there suggested themselves to my mind serious difficulties with respect both to the authority and the mode by which it was attempted to place that controversy within the cognizance of this tribunal.

I was unable to perceive by what warrant a judge of a circuit court, circumscribed in his jurisdiction both as to parties and to subjects-matter of litigation within specified limits, could claim cognizance as to parties and subjects-matter confessedly beyond the prescribed bounds of his jurisdiction.   Still less could I comprehend by what warrant a circuit judge could, by an interlocutory order at chambers, relative to rights of person and property beyond the bounds of his jurisdiction, transfer a controversy affecting subjects thus situated to the supreme court of the United States.

An attempt to avoid these difficulties (for they were not directly met) was essayed, by the assumption that the application to the circuit court might be adopted here, as the commencement of an original suit by the State of Pennsylvania, that State possessing the right to institute an action in the supreme court, under the provision in the constitution which defines the original jurisdiction of that court.   Accordingly, this case was received and treated as one authorized by the constitution, in virtue of the original jurisdiction vested exclusively in the supreme court —a jurisdiction which an inferior court, or a judge of an inferior court, could have no power to exert.

However irregular and unauthorized the first proceeding in this case appeared to me, the granting of the second injunction, and the measures directed for enforcing it, I am constrained to regard as still more irregular,—a much wider departure from precedent or legitimate authority.

This second proceeding brings to our notice the following state of facts:  An application to a circuit judge at chambers, to control by compulsory process persons and property, both of them situated beyond and without the bounds of his legitimate power.   This application is granted at chambers, and not by a proceeding in court at all ; and the order of the judge so made, and the mandate directed by him singly for the execution of his order, are entitled as a proceeding in and before the supreme court, and as an act of the supreme court ; and the peculiar and appropriate officer of this tribunal is ordered to carry that mandate into effect.

According to my interpretation of the constitution of the United States, the supreme court is a distinct, aggregate, collective body—one which can act collectively, and in term or in united session only. It cannot delegate its functions, nor can it impose its duties upon any number of the body less than a quorum, constituted of a majority of its members. Much less can a single judge be clothed with its joint powers, to be wielded by him at any time or in any place, or to any extent to which his individual discretion may point. Yet, in the case before us, we have a proceeding begun, prosecuted, and consummated in the name of the supreme court—nay, denominated their proper act when eight of the nine judges constituting this tribunal had no participation in that proceeding, perhaps never even suspected its existence. It may very well be inquired whether a majority of the judges, either acting individually or collectively in court, would, on principles of power or of justice, have sanctioned the course pursued in this case? For one, I can answer that by him it would have been unhesitatingly rejected.

Yet this course it is now attempted to justify and sustain, under the 5th section of the act of congress of the 2d of March, 1793, (1 Stats. at Large, 334,) which provides that "writs of *ne exeat* and injunction may be granted by any judge of the supreme court in cases where they might be granted by the supreme court or a circuit court."

The inference sought to be drawn from the provision just cited, I propose cursorily to examine, with the view of showing its incorrectness as a deduction from the language or the purposes of that provision, and especially with the view of exposing the total inapplicability of the attempted conclusion to the facts developed by the record before us.

The subjects embraced within the proposed inquiry, namely, the distribution and exercise of power in the different divisions of the federal judiciary—the definition and establishment of the distinctive boundaries within which those several divisions should revolve, are matters of an importance much too grave to be incidentally or lightly disposed of. They are matters inseparable alike from the order and harmony and stability of public authority, and from the safety and enjoyment of private right.

By the act of congress establishing the judicial courts of the United States, (1 Stats. at Large, 81,) no power was conferred upon the judges of the courts of the United States to grant writs of injunction; nor was the power to grant an injunction *eo nomine* conferred upon any of the courts. This authority was, however, as to the courts, given by implication in the 14th section of the statute, which authorized the courts therein before enumerated, to grant writs of *scire facias, habeas corpus,* and

all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions.

The feature of this provision proper for consideration here is this; that the power was conferred upon the courts, and not upon the judges, and was given in cases only in which it was necessary for the exercise of the jurisdiction of those courts. What was the jurisdiction of the circuit courts, as to persons or property, or both? With respect to proceedings *in rem*, as the process of the court could not run beyond the prescribed limits of its appropriate district, the jurisdiction or power of the court could be coextensive only with those limits, and was consequently, impotent and null as to any direct control of the subject matter when situated beyond them. And with respect to the jurisdiction over persons or parties, we find it declared by the 11th section of the judiciary act, that " no civil suit shall be brought before either of the said courts, against an inhabitant of the United States, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ;" and so careful have been the authors of this restriction to insure its effectual observance, that in the same section of the statute they have prohibited every transfer of the interests or rights of parties made with the view of evading its operation. An interpretation of the 11th section of the judiciary act—one conclusive upon the jurisdiction of the circuit courts —has been declared in repeated decisions by this court, as may. be seen amongst other instances which might be adduced, in the cases of M'Micken *v.* Webb, 11 Pet. 36; of Toland *v.* Sprague, 12 Pet. p. 300; and of Keary *v.* The Farmers and Mechanics' Bank of Memphis, 16 Pet. p. 89. In the second of the cases just cited, the effect of the statute in defining the jurisdiction of the circuit courts is examined with much minuteness and particularity.

It follows, then, by necessary induction, both from the language of the judiciary act and from the interpretation thereof by this court, that the jurisdiction—as auxiliary to which, and as a means of enforcing its exercise, the power to grant injunctions was conferred upon the circuit courts—is that jurisdiction restricted to persons and property found within the prescribed local bounds assigned to those courts.

But it has been argued, that whilst the restrictions above mentioned may be imposed upon the courts as such, in the most solemn and deliberate exercise of their functions, the judges individually, out of court, and distinguished as they are by the language of the law from the courts, have been released from the same or similar restraints, and have been clothed with power separately to exert this extraordinary jurisdiction over persons

and property residing or situated anywhere and everywhere within the United States. Nothing more is required, according to this argument, to overstep the fixed and designated boundary of the courts' authority than the *sic jubeo* of the individual judge.

In considering the interpretation now placed upon the 5th section of the act of March 2, 1793, the mind is impressed with the irregularity and inconsistency which this interpretation implies; and with the inutility and inefficiency for any beneficial object, of the power it is said to have created. It is certainly a novelty, and an anomaly in jurisprudence, to allege in a judicial officer acting out of court, and as it were *in pais*, the existence of a jurisdiction over persons and property with respect to which he has no power to adjudicate in court, and his acts in relation to which he possesses no authority to reverse or modify or even to revise. Yet this is precisely the attitude which the circuit courts and the judges of those courts are made to occupy in relation to each other, by the interpretation now attempted.

In the next place, so far as usefulness or efficiency may be supposed to have been the objects of the statute, much of these are taken away by denying to the courts the power claimed for the judges out of court to act upon persons or property beyond the bounds of the respective circuits. The same necessity which would dictate a resort to one, requiring equally a resort to both or either.

Some obscurity and difficulty is perceived and felt as arising from that portion of § 5 of the act of March 2, 1793, which permits the judges of the circuit courts to grant injunctions in cases wherein they might be granted by the supreme court; but this language it is thought, when correctly understood, operates no change, or extension, or enlargement of the powers and jurisdiction of the circuit courts, or of the judges of those courts. If indeed it should be contended that this section of the statute was designed to confer, or by its terms purported to confer upon the circuit courts, or upon the judges thereof, the jurisdiction and functions of the supreme court, then must that section, so far at least, be rejected as absolutely void, being in violation of the constitution.

The supreme court of the United States is the creature of the constitution. By this instrument its powers and jurisdiction original and appellate, are conferred and defined; these are peculiar and exclusive, and by no legislation can they be enlarged or diminished, much less can they either in whole or in part, be delegated to other tribunals or officers of any grade or description.

I am clearly of the opinion therefore, that by the 5th section

of the act of 1793, no power to exercise authority or jurisdiction appertaining to the supreme court was, or could have been, conferred either upon the circuit courts or upon the judges thereof; but that this section must be understood as simply conferring upon the judges a power previously confined to the courts alone —namely, the power to grant injunctions, and this subject to every limitation by which the circuit courts were controlled.

But the interpretation of the act of 1793 now contended for, broad as it is, still is not wide enough to cover the proceeding which it is now used to shield and protect. To accomplish this end, it must be stretched still more; and until it can be made to comprise an identification of a single judge of the supreme court with the entire court itself, and the transformation of an act by an individual judge—an act performed without the accustomed formalities of a regular court—into a proceeding by the supreme court in the exercise of its constitutional and only legitimate functions.

The order granting the second injunction in this case, were it obnoxious to no other objection, appears to me to be unwarranted and void, for the reason that it assumes to contravene and overrule in effect, if not in terms, an existing decree of this court, between these same parties and upon the same subject-matter.

The decree of this court, first pronounced in February, 1852, decided that the suspension bridge at Wheeling was an obstruction to the passage of steamboats on the Ohio River, and that unless it should be elevated to the height of one hundred and eleven feet above low-water mark, before the 1st day of February next following this decree, it should be abated. Upon a subsequent day of the same term, the decree was so modified as to substitute for the requirement of increased elevation, or of the alternative of an abatement, permission to the proprietors of the suspension bridge to construct in the permanent wooden bridge, which spans the western channel of the river, a draw of a capacity sufficient for the passage of steamboats of the largest class; the additional distance or the short delay (of a few minutes only) incident to this arrangement constituting, as expressed in the language of this court, "no appreciable injury to commerce." Liberty was reserved by this decree to either party to "move the court in relation to this matter on the 1st Monday of February ensuing." *Vide* 13 How. 625.

In obedience to a notice from the complainant, under the liberty reserved in the decree, the defendants appeared on the regular return day by counsel in court; but the complainant failing to prosecute this motion, it was permitted to be discontinued. To a second notice to the defendants they again appeared, but

the complainant again making default, was formally called, and the motion was dismissed.

From this failure or refusal on the part of those who were authorized to move in the case, this court, for aught that could be judicially known to them, might have been justified in the conclusion, that every thing they had ordered had been complied with, or had been arranged to the mutual satisfaction of the parties. Certainly up to this period, there was no fact regularly and formally before them, on which to found or justify process for contempt. Under this state of things, the suspension bridge at Wheeling remained, and was authorized to remain.

This court had prescribed the conditions, according to which it was to stand or to be abated, and had designated the parties by whom, the modes by which, and the extent to which, the decree might be carried into effect.

In this attitude of the case, a mandate is issued from a judge at chambers, superseding the mode pointed out by this court for the execution of its decree, and wholly irrespective of any condition according to which that decree had been, by its own terms, modified, as above mentioned.

The above mandate assumes to order, in the name of this court, that no bridge of an elevation less than that prescribed by this order, shall be thrown across the Ohio from Zane's Island to Wheeling, regardless altogether of any facility, however complete, which might be provided for the passage of steamboats by the western channel of the river.

This mandate therefore, was itself a palpable violation of the decree of this court, and of rights reserved to the defendants by that decree—rights which they twice evinced their readiness to vindicate before this court, in opposition to the reiterated, but subsequently abandoned attempts by the complainant to assail them.

Can contempt, then, be affirmed or imputed with reference to a readiness to yield obedience to the regular authority of the court, or with reference to an unwillingness to comply with a proceeding not merely void in itself, but one also in manifest violation of the constitution and the law?

To which it may be asked, were the defendants bound to conform to the authority of this court, deliberately announced upon a question regularly before them as a court, or to an order from a single judge, obviously in contravention of the former, assuming to exercise an authority belonging only to the court as an aggregate body, and by which assumption this court is placed in an attitude adversary to its own decree?

There is still another view of this case, which, to my mind, is conclusive against the proceedings on the part of the circuit

judge, and equally so against every motion now urged before us as founded thereon, or on either the principal or modified decree heretofore pronounced in this cause.

Previously to the application for the second injunction, the congress of the United States, by a formal statutory enactment, declared the bridges which had been erected over the Ohio at Wheeling in Virginia, and at Bridgeport in the State of Ohio, abutting on Zane's Island, to be lawful structures in their present position and elevation, "any thing in any law or laws of the United States to the contrary notwithstanding." And they further enacted, "that the officers and crews of all vessels and boats navigating the said river, are required to regulate the use of their said vessels and boats, and any pipes, or chimney, or chimneys belonging thereto, so as not to interfere with the elevation and structure of the said bridges." *Vide* 10 Stats. at Large, 112.

Against the effect of these very explicit enactments, it has been contended that they are void, because, as it is said, they reverse a decision of this court, which congress has no power to do. In answer to this argument, it may be conceded that the position assumed by it might be true with reference to the adjustment or security of private rights vested under previously existing laws or adjudications; but such a position is wholly inapplicable to measures of public policy falling appropriately within the legislative competency, and much less can it have any influence to warrant in any other department of the government the exercise of powers vested exclusively in the national legislature.

It is impossible to read either the original or the modified decree, by the majority of the court in this cause, without perceiving that both these decrees, as well as the entire argument in support of them, were based upon the single assumption that the erection of the suspension bridge at Wheeling was an interference with the right to regulate commerce vested in congress by the constitution. It is equally manifest, from the arguments and opinions of the minority of the court, that the right in congress to regulate commerce is not only conceded by the minority, but the exclusiveness of that power in congress is insisted upon. These later opinions maintain the doctrine that congress alone are competent to exercise this right or power, and can neither be controlled nor anticipated with respect to it by the judicial department, upon any fancied necessity, nor upon any supposed neglect, or omission, or incompetency, which the latter may impute to congress, and may imagine the judicial department called upon to remedy.

In these views are seen essentially, nay explicitly, the diversity

existing in the opinions of the majority and minority of the
judges, as declared in this case.

Congress have, by statute already referred to, undertaken to
regulate the commerce upon the Ohio River, so far as the mat-
ters involved in this controversy are concerned. And who shall
question their power to do this? Does it belong to this court,
under any article or clause of the constitution, or of any statute,
to assume such a superiority? Congress have ordained that
the vehicles of commerce on the Ohio, the steamboats, shall so
graduate the height of their chimneys, as not to interfere with
the bridges at Wheeling, as existing at the date of the statute.
By this they have at least declared that these bridges are deemed
by them no invasion either of the power or the policy of con-
gress with reference to the commerce of the Ohio River. They
have regulated this matter upon a scale by them conceived to
be just and impartial, with reference to that commerce which
pursues the course of the river, and to that which traverses its
channel, and is broadly diffused through the country.

They have at the same time by what they have done, secured
to the government, and to the public at large, the essential ad-
vantage of a safe and certain transit over the Ohio—an advan-
tage which, previously to the erection of the Wheeling bridge,
was greatly desired but never attained.

In what has been done by congress, I can have no doubt that
they have acted wisely, justly, and strictly within their constitu-
tional competency. By their action they have completely over-
thrown every foundation upon which the decrees of this court,
the orders of the circuit judge, and every motion purporting to
be based upon these or either of them, could rest. I am, there-
fore, of the opinion that each and every motion submitted by
the complainant under color of the decrees heretofore pronounced
in this cause, or of the injunction awarded by the judge of the
circuit court, should be overruled; that the injunction awarded
as aforesaid should be dissolved, and the bill praying for that
injunction should be dismissed; and that in each instance the
defendants should be decreed their costs.

*Order—in the original case.*

This court at a prior term, to wit, on 27th May, 1852, having
declared that the bridge of the respondents was an obstruction
to the navigation of the Ohio River, and that it did a special
damage to the complainant, and having decreed that the same
should be altered as thereby directed, or removed by the respon-
dents, and the complainant having subsequently moved this
court for writs of assistance, of sequestration and of attach-
ment against the said respondents, and also for a taxation of

State of Pennsylvania *v.* Wheeling and Belmont Bridge Co.

the costs decreed by this court, and for the process of this court to enforce the payment thereof by the said respondents, and the congress of the United States having by an act passed on the 31st of August, 1852, entitled " An act making appropriations for the service of the Post-Office Department, during the fiscal year ending the 30th of June, 1853, and for other purposes," provided for the navigation of the Ohio River, and so regulated the navigation of the said river as to be consistent with the maintenance of the said bridge. And the respective parties having been fully heard by counsel, and after mature deliberation thereupon had by this court, it is now here considered and decreed by this court that the said motion for writs of assistance, sequestration, and attachment, be and the same is hereby overruled, and that the said writs be and they are hereby denied. And it is further considered and decreed by the court that the said complainant do have and recover from the said respondents the costs of the said complainant as decreed by this court on the aforesaid 27th day of May, A. D. 1852, to be taxed by the clerk, and that the said respondents do pay the same to the complainant within ninety days from this date; and that, in default of such payment, that execution do issue therefor to be directed to the marshal of the United States for the District of Columbia to enforce the same.

*Order—with respect to the bill filed before Mr. Justice Grier and injunction issued by his order.*

This cause came on to be heard upon the bill of complaint, an order by the Honorable R. C. Grier, an associate justice of this court, on the 26th day of June, 1854, granting an injunction as prayed for in the said bill, and upon the motion by the complainant for writs of assistance, of sequestration, and of attachment against the said respondent, and upon a motion by the respondent to dissolve the said injunction, and was fully argued by counsel on both sides; upon consideration whereof, and after mature deliberation thereupon had, it is now here ordered and decreed by this court that the said motion by the said complainant for writs of assistance, of sequestration, and of attachment, be and the same is hereby overruled, and that the said injunction, so as aforesaid granted, be and the same is hereby dissolved.