**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA, by and
through Attorney General Xavier
Becerra and the California Air
Resources Board; STATE OF
ILLINOIS; STATE OF MARYLAND;
STATE OF NEW MEXICO; STATE OF
OREGON; COMMONWEALTH OF
PENNSYLVANIA; STATE OF RHODE
ISLAND; STATE OF VERMONT,
        *Plaintiffs-Appellees*,

ENVIRONMENTAL DEFENSE FUND,
     *Intervenor-Plaintiff-Appellee*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; ANDREW WHEELER, Acting
Administrator of the U.S.
Environmental Protection Agency,
        *Defendants-Appellants*,

and

E. SCOTT PRUITT, Administrator,
U.S. EPA,
        *Defendant.*

No. 19-17480

D.C. No.
4:18-cv-03237-
HSG

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted July 17, 2020
San Francisco, California

Filed October 22, 2020

Before:  Eugene E. Siler,[*] Kenneth K. Lee, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bumatay

## SUMMARY[**]

### Environmental Law

The panel reversed the district court's decision to deny a Fed. R. Civ. P. 60(b) motion to modify an injunction which required the U.S. Environmental Protection Agency ("EPA") to promulgate its federal landfill emissions plan by November 6, 2019.

Several States sued to force the EPA to promulgate its federal plan.  Subsequent to the district court's May 6, 2019 injunction order, the EPA promulgated new regulations

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

moving the EPA's deadline for promulgating a federal plan to August 30, 2021. Faced with the dueling deadlines of the district court's injunction requiring a plan by November 6, 2019, and the new regulations establishing August 30, 2021 as the deadline, the EPA filed its Rule 60(b) motion requesting relief from the district court's injunction.

The panel held that the district court abused its discretion in denying the EPA's request for relief under Fed. R. Civ. P. 60(b)(5) because EPA's new regulations constituted a change in law, and removed the legal basis for the court's deadline. A shift in the legal landscape that removed the basis for an order warranted modification of the injunction. The panel rejected the States' contention that courts must look beyond the new regulations and conduct a broad, fact-specific inquiry into whether modification prevented inequity. The panel remanded with instruction for the district court to modify the injunction consistent with this opinion.

## COUNSEL

Joan M. Pepin (argued), David Gunter, and Leslie M. Hill, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Matthew C. Marks and Karen J. Palmer, Attorneys, EPA Office of General Counsel, Washington, D.C.; for Defendants-Appellants.

Elizabeth B. Rumsey (argued) and Julia K. Forgie, Deputy Attorneys General; Gary Tavetian and David A. Zonana, Supervising Deputy Attorneys General; Robert Byrne and

Sally Magnani, Senior Assistant Attorneys General; Xavier Becerra, Attorney General; Office of the Attorney General, Oakland, California; Kwame Raoul, Attorney General; Daniel I. Rottenberg, Assistant Attorney General; Attorney General's Office, Chicago, Illinois; Brian E. Frosh, Attorney General; Leah J. Tulin, Assistant Attorney General; Attorney General's Office, Baltimore, Maryland; Hector Balderas, Attorney General; Bill Grantham, Assistant Attorney General; Office of the Attorney General, Albuquerque, New Mexico; Ellen F. Rosenblum, Attorney General; Paul Garrahan, Attorney-Charge, Natural Resources Division; Oregon Department of Justice; Salem, Oregon; Josh Shapiro, Attorney General; Michael J. Fischer, Chief Deputy Attorney General; Robert A. Reiley, Assistant Director, Department of Environment Protection; Office of the Attorney General, Harrisburg, Pennsylvania; Thomas J. Donovan Jr., Attorney General; Nicholas F. Persampieri, Assistant Attorney General; Office of the Attorney General; Montpelier, Vermont;  for Plaintiffs-Appellees.

Susannah Weaver (argued) and Matthew Littleton, Donahue Goldberg Weaver & Littleton, Washington, D.C.; Peter Zalzal and Rachel Fullmer, Environmental Defense Fund, Boulder, Colorado; for Intervenor-Plaintiff-Appellee.

**OPINION**

BUMATAY, Circuit Judge:

On one level this case is about trash. When we toss our food packaging, the core of an apple, or almost any other material, our garbage winds up in one place: municipal solid-waste landfills. Over a thousand of these landfills are littered across the country to store and process household waste. Responsibility for regulating such landfills rests with the Environmental Protection Agency, in cooperation with states. This includes promulgating emissions guidelines—because gases like methane and carbon dioxide are produced as a byproduct of the waste-decomposition process—and issuing plans detailing how those guidelines will be implemented.

EPA promulgated new landfill emissions guidelines in 2016. Doing so set off a series of mandates for states and EPA. First, each state was required to submit a plan on how it would implement the new guidelines. Second, EPA was to approve or disapprove each state plan it received. Finally, for states that failed to submit a plan at all, EPA had to promulgate a federal plan that would govern implementation in those states. The deadline for EPA to comply with its final requirement—issuing the federal plan—was set by regulation for November 30, 2017. But EPA blew this deadline.

Several states sued to force EPA to promulgate its federal plan. While EPA responded to the suit, it also kicked off the rulemaking process to extend its regulatory deadline for issuing a federal plan. While this rulemaking was underway, the district court ruled for the plaintiff states and entered an injunction requiring EPA to promulgate the plan within six months. A few months later, EPA finalized the

rulemaking process, which extended its regulatory deadline by two years.

At this point, EPA faced two conflicting deadlines: November 2019 under the court's order and August 2021 under the amended regulations. EPA asked the district court to modify the injunction, but it declined to do so. Instead, the district court found the prior injunction "pose[d] no obstacle" to EPA and that, in spite of the new regulations, "all other circumstances indicate that enforcement of the judgment is still equitable." *California v. EPA*, No. 18-cv-3237-HSG, 2019 WL 5722571, at *3–4 (N.D. Cal. Nov. 5, 2019).

So, this case is not just about trash, landfills, or emissions guidelines; it's also about the separation of powers and the limits of a court's equitable discretion. We're asked to decide whether a district court abuses its discretion by refusing to modify an injunction even after its legal basis has evaporated and new law permits what was previously enjoined. We answer affirmatively and reverse.

## I.

EPA is empowered to regulate "new" and "existing" sources of pollution under the Clean Air Act. *See* 42 U.S.C. §§ 7410, 7411. For any "new" sources, EPA shoulders primary regulatory responsibility. *See id.* § 7411(b), (c). But regulation of "existing" sources is a joint enterprise between EPA and the states. *See id.* § 7411(d)(1).

From 1975 until 2019, EPA regulations for existing sources of pollution required a series of actions upon the issuance of any new emissions guidelines. Under these regulations, states were given nine months to submit an implementation plan after EPA publishes new emissions

guidelines. 40 C.F.R. § 60.23(a)(1). Within four months of that deadline, EPA had to approve or disapprove of the plan. *Id*. § 60.27(b). If a state failed to submit a plan of its own, EPA had to issue a federal plan that would govern. *Id*. § 60.27(d). EPA had six months from the state-submission deadline to do so. *Id.*

Our case concerns the emissions guidelines, and required implementation plans, for municipal solid-waste landfills. In 1996, EPA established emissions guidelines for such landfills, requiring the installation of control technology if they emitted more than 50 megagrams of certain air pollutants in a year. 61 Fed. Reg. 9905, 9907 (Mar. 12, 1996). EPA amended those guidelines in 2016 to lower the emissions threshold from 50 to 34 megagrams annually. 81 Fed. Reg. 59,276, 59,278 (Aug. 29, 2016).

This amendment triggered the regulatory timeline for action discussed above. *See* 40 C.F.R. § 60.30f(a) (2016). First, each state was required to submit a plan by May 30, 2017. *Id*. § 60.30f(b). Second, EPA was required to approve or disapprove of such plans by September 30, 2017. 81 Fed. Reg. at 59,304. Finally, EPA was required to promulgate a federal plan by November 30, 2017. *Id.*

EPA missed its deadlines: September 30th and November 30th came and went, but EPA failed to approve any state plan or issue a federal plan. In May 2018, several states brought suit alleging that EPA violated its own regulations and sought an injunction compelling the agency to promulgate a federal plan.[1]

---

[1] The plaintiffs are California, Illinois, Maryland, New Mexico, Oregon, Pennsylvania, and Vermont, as well as the California Air

Five months later, in October 2018, EPA began a rulemaking process to amend the timing regulations at the heart of the States' suit. EPA's stated goal was to bring its regulatory deadlines for existing-source pollution in line with statutory timelines for new-source pollution under 42 U.S.C. § 7410.  84 Fed. Reg. 32,520, 32,564 (July 8, 2019).  EPA then moved for a stay of the litigation pending resolution of the rulemaking process.  The district court refused to stay the litigation.  As the case went on, EPA made an additional attempt to continue the case, in light of the government shutdown at the time, but its motion was denied.

At the end of the day, the States prevailed.  On May 6, 2019, the district court entered an injunction requiring EPA to approve or disapprove of state plans by September 6, 2019.  (EPA has already complied with this part of the court's injunction, so it is not at issue here.)  The district court also required EPA to issue a federal plan by November 6, 2019.

About two months after the district court's order, EPA completed the rulemaking process, and the new timing regulations were promulgated.  84 Fed. Reg. 32,520.  Under the new regulations, (1) states have three years after EPA promulgates new emission guidelines to submit an implementation plan, 40 C.F.R. § 60.23a(a)(1); (2) EPA must take action to approve or disapprove of a state plan within a year, *id*. § 60.27a(b); and (3) EPA must issue any federal plan within two years, *id*. § 60.27a(c).  On August 26, 2019, EPA finalized a regulatory amendment that made the new timing regulations applicable to the 2016 emissions guidelines.  *See* 84 Fed. Reg. 44,547.  Between these two

Resources Board and Plaintiff-Intervenor Environmental Defense Fund (collectively, the "States").

regulations, EPA's deadline to promulgate a federal plan was pushed out to August 30, 2021.

EPA then confronted dueling deadlines: comply with the district court's injunction requiring a plan by November 6, 2019, or follow the new law establishing August 30, 2021, as the deadline.[2]  To resolve this dilemma, EPA filed a motion under Federal Rule of Civil Procedure 60(b)(5) requesting relief from the district court's injunction.  The district court denied the motion but temporarily stayed its injunction.  EPA brought the appeal now before us and moved for a stay of the district court's injunction pending appeal, which was granted by a motions panel.

We review "for an abuse of discretion the district court's decision to deny a Rule 60(b) motion, and review de novo any questions of law underlying the decision to deny the motion." *Deocampo v. Potts*, 836 F.3d 1134, 1140 (9th Cir. 2016).

## II.

Although a court's order is ordinarily final, the Federal Rules of Civil Procedure provide some exceptions.  Rule 60(b) enumerates when a party may obtain relief from a court's judgment or order.  As relevant here, a court "may"

---

[2] The new regulations are currently being challenged before the D.C. Circuit.  *See New York v. EPA*, No. 19-1165 (D.C. Cir.); *Appalachian Mountain Club v. EPA*, No. 19-1166 (D.C. Cir.); *Environmental Defense Fund v. EPA*, No. 19-1222 (D.C. Cir.); *California v. EPA*, 19-1227 (D.C. Cir.).  But no party has moved to stay the new regulations pending the D.C. Circuit's review, so they are undisputedly in effect.  Given this procedural posture, we assume, without deciding, that the new regulations were duly promulgated so as to properly effectuate a change in the law.  We leave it to our colleagues on the D.C. Circuit to decide if that's actually true.

modify an injunction when "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).

If this sounds like a pliable standard, that's because it is. But this flexibility is a virtue, not a vice.  Historically, what made courts of equity different was that they could be "flexible" and "adjust their decrees, so as to meet most, if not all" of the exigencies to do justice for the parties.  *See* Joseph Story, W. H. Commentaries on Equity Jurisprudence as Administered in England and America, Vol. 1 26–27 (C.C. Little & J. Brown eds., 1846).  Such courts could "vary, qualify, restrain, and model the remedy, so as to suit to mutual and adverse claims, controlling equities, and the real and substantial rights of all the parties."  *Id.* at 27. Indeed, equity exists "[b]ecause it is impossible that any code, however minute and particular, should embrace or provide for the infinite variety of human affairs, or should furnish rules applicable to all of them[.]" *Smith v. Davis*, 953 F.3d 582, 590 (9th Cir. 2020) (en banc) (simplified).

Rule 60(b)(5), and its malleable standard for modifying an injunction, preserves the courts' historical discretion over injunctions.  *See Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999) ("[T]he Rule codifies the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees.") (simplified).  But judicial discretion— historically and now—is not unbridled.  *See* 1 William Blackstone, Commentaries on the Laws of England *62 ("[T]he liberty of considering all cases in an equitable light must not be indulged too far, lest thereby we destroy all law, and leave the decision of every question entirely in the breast of the judge."); *Sys. Fed'n No. 91, Ry. Emps.' Dep't, v. Wright*, 364 U.S. 642, 648 (1961) ("*Railway Employees*") ("[D]iscretion is never without limits and these limits are

often far clearer to the reviewing court when the new circumstances involve a change in law rather than facts."). American equity jurisprudence, thus, reflected an "effort to restrain the discretion courts of equity once wielded and to roundly reject a view in which equity depends on the length of each chancellor's foot." *Smith*, 953 F.3d at 604 (Berzon, J., dissenting) (simplified).

EPA argues here that the district court abused its discretion by forcing the agency to comply with the injunction, despite the regulations having been amended to extend the time to issue a federal plan to August 2021. The States respond that courts must look beyond the new regulations and conduct a broad, fact-specific inquiry into whether modification prevents inequity. They seek affirmance since EPA hasn't shown that it would be harmed if forced to continue to abide by the court's injunction. We hold that the district court's refusal to modify the injunction here, when a change in law dissolved the legal basis for its order, is an abuse of discretion.

## A.

### 1.

An unbroken line of Supreme Court cases makes clear that it is an abuse of discretion to deny a modification of an injunction after the law underlying the order changes to permit what was previously forbidden. Consider first the decision in *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855) ("*Wheeling Bridge*"). The Court had ordered that an unlawful structure, a bridge, be destroyed and enjoined from being rebuilt. *Id.* at 423. Congress later established it as a postal route, thereby legalizing the bridge. *Id.* at 422, 426. As fate would have it, the bridge was destroyed in a storm, but the defendant still wanted it rebuilt.

Accordingly, the defendant sought modification of the decree, which was granted.  The Court explained, as a "continuing decree," if the law "has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced." *Id.* at 431–32.  For this conclusion, the Court relied solely on the fact that the new law permitted what was forbidden under the injunction—without engaging in any balancing of the harms to the parties.

Nearly a century later, the Court reiterated that a change in law that alters a party's legal duty requires modification of an injunction that is based on superseded law.  Prior to 1951, the Railway Labor Act prohibited union shops at railroad companies—meaning non-union employees couldn't be coerced into joining a union at those companies. *Railway Employees*, 364 U.S. at 643–44.  Based on that law, a railroad company, its unions, and its employees entered into a consent decree that prevented the company from treating non-union employees differently from union employees. *Id.* at 644.  In 1951, Congress amended the Act to permit union shops. *Id.*  In response to a modification request, the Court thought it "plain" that the decree should be lifted. *Id.* at 649.  Had the order been an injunction, rather than a consent decree, the Court explained, "it would have been improvident for the court to continue in effect th[e] provision of the injunction prohibiting a union shop agreement." *Id.* at 648.  But as a consent decree, the analysis also required reviewing the law's impact on the parties' expectations.  Nonetheless, based on *Wheeling Bridge*, the Court expressly stated: "That it would be an abuse of discretion to deny a modification of the present injunction if it had not resulted from a consent decree we regard as established." *Id.* at 650.  Again, it reached this conclusion

based only on the amendment to the law, without regard for any other equitable factors.

Finally, *Agostini v. Felton*, 521 U.S. 203 (1997), points in the same direction.  There, New York City was enjoined from sending public school teachers to parochial schools.  *Id.* at 212.  Twelve years later, the City sought relief from the injunction, arguing that Establishment Clause jurisprudence had shifted so significantly that the prior cases supporting the injunction were no longer good law.  *Id.* at 208–09.  The Court agreed and held—without any analysis of other equitable factors—that the City was entitled to relief from the prospective injunction.  *Id.* at 215–17.  It explained that "[a] court may recognize subsequent changes in either statutory or decisional law" giving rise to an injunction, and a "court errs when it refuses to modify an injunction or consent decree in light of such changes."  *Id.* at 215.  Thus, *Agostini* confirms the equitable principle that when the law changes to permit what was previously forbidden, it is an abuse of discretion to not modify an injunction based on the old law.[3]

We have likewise held that a shift in the legal landscape that removes the basis for an order warrants modification of an injunction.  In *California Department of Social Services v. Leavitt*, we considered an injunction issued against two

---

[3] The States argue that *Agostini* did not just consider the jurisprudential shift, but instead conducted a more fact-specific analysis regarding the equitableness of modifying the injunction.  It's true that the Court balanced the equities, but it did so only in response to the dissent's charge that the Court should have waited for a "better vehicle" to examine the continued vitality of its prior Establishment Clause case.  *See id.* at 239–40; *id.* at 259 (Ginsburg, J., dissenting) (objecting to the majority's "problematic use of Rule 60(b)" to announce the very change in the law that justified modification of the injunction).

state agencies requiring them to comply with our interpretation of a federal aid program. 523 F.3d 1025, 1027 (9th Cir. 2008). Congress later passed a law amending the statutory basis of that program, which made clear that our reading was wrong. *Id.* at 1029. The agencies then moved for relief from the injunction. *Id.* at 1030. We upheld the district court's decision to modify the injunction because the new statute had "removed the legal basis for the continuing application of the court's Order" and "[a] 'change in law' of [that] type 'entitle[d] petitioners to relief under Rule 60(b)(5).'" *Id.* at 1032 (quoting *Agostini*, 521 U.S. at 237). To reach this conclusion we followed the Court's lead—we relied solely on the amended law without considering other equitable factors. Elsewhere, we've recognized as settled that "[w]hen a change in the law authorizes what had previously been forbidden, it is an abuse of discretion for a court to refuse to modify an injunction founded on superseded law." *Toussaint v. McCarthy*, 801 F.2d 1080, 1090 (9th Cir. 1986) (simplified).

Other circuits have adopted similar approaches. *See Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316, 1318–19 (D.C. Cir. 1982) (holding that new law, by itself, warranted modification of an injunction); *Williams v. Atkins* 786 F.2d 457, 463 (1st Cir. 1986) (holding modification is warranted when the "legal predicate for [a] consent decree has changed so substantially[,] that [the decree] is now without a foundation in current federal law and it in part conflicts with federal law"); *Sweeton v. Brown*, 27 F.3d 1162, 1166–67 (6th Cir. 1994) (en banc) (reversing the district court and remanding with instructions to dissolve injunctions imposed by a consent decree based on a change in the law); *Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1187 (7th Cir. 1994) (lifting of injunction was "mandated" by Congress's amendment to the Clayton Act). Once again,

in these cases, our sister circuits did not balance the harms caused by modifying an injunction—instead they viewed the revisions in the law as sufficient to require modification.**[4]**

## 2.

The States contend that other precedent requires a broad, fact-intensive inquiry into whether altering an injunction is equitable, even if the legal duty underlying the injunction has disappeared.  We disagree.

The States first point to *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). While *Rufo* conducted this type of analysis, that case is easily distinguishable.  Instead of an injunction, the Court was considering a consent decree, which is a contract-like judgment that turns on the parties' expectations.  *See id.* at 378 (consent decrees reflect "an agreement of the parties and thus in some respects [are] contractual in nature").  Here, the injunction was not entered by consent, so there is no need to consider the parties' expectations in submitting to the district court's order.  *Cf. id.* at 389 (parties to a consent decree may "settle the dispute . . . by undertaking to do more than the Constitution itself requires" and "more than what a court would have ordered

---

**[4]** *But see Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 650 (1st Cir. 1972) ("[A] change in applicable law does not provide sufficient basis for relief under Rule 60(b)(5)."); *De Filippis v. United States*, 567 F.2d 341, 344 (7th Cir. 1977) ("The *Kelley* decision, even if applicable, was not by itself such a subsequent event as to render inequitable continued application of the injunction."), *overruled in part, United States v. City of Chicago*, 663 F.2d 1354 (7th Cir. 1981) (en banc).

absent the settlement").**5**   Indeed, five years after *Rufo*, the Court in *Agostini* returned to an injunction and relied solely on a jurisprudential shift to hold that the district court abused its discretion in not modifying the order.  521 U.S. at 208.**6**

Nor does *Bellevue Manor* compel a different conclusion. There, we considered whether a congressional amendment and Court decision discredited the legal basis of an injunction, but also went on to analyze additional factors that supported the district court's decision to modify an injunction.  *See Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1254 (9th Cir. 1999).  But we did so because of the unusual procedural posture:  We had previously remanded, in an unpublished disposition, for the district court to consider a variety of factors under a prior (and more stringent) test for modification.  *Id.* at 1254.  After the district court did so, and held that modification of the injunction was warranted, the case came back up on appeal.  Out of respect

---

**5** The States correctly note that the *Rufo* analysis has been applied to injunctions as well as consent decrees.   But these cases involved modification requests based on changed *factual circumstances*, not new law.  *See Horne v. Flores*, 557 U.S. 433, 459, 462–63 (2009); *SEC v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2001).    Unsurprisingly, modifications requested based on a change in facts necessitate a broad, fact-intensive analysis.  But this offers little guidance on a Rule 60(b)(5) motion based on superseding law, as is the case here.

**6** Nor do we find persuasive the States' claim that various cases hold that the *Rufo* standard applies to "all" modification requests under Rule 60(b)(5).  The States rely on language yanked out of context.  Our discussion about the *Rufo* analysis applying to "all" requests for modification simply refers to the fact that *Rufo* is not limited to "institutional reform litigation."  *Bellevue Manor*, 165 F.3d. at 1250, 1255; *see also United States v. W. Elec. Co.*, 46 F.3d 1198, 1203 (D.C. Cir. 1995) (same); *In re Matter of Hendrix*, 986 F.2d 195, 198 (7th Cir. 1993) (same).  Such language does not mean that courts must conduct the *Rufo* analysis in cases like this.

for the district court's efforts, we considered the more stringent factors—despite ultimately overruling the test— and concluded that they weighed in favor of modification. *Id.* Because other reasons supported the district court's decision to grant modification, we dodged the question of whether the change in the law alone warranted dissolution of the injunction. Today we answer that question affirmatively.

Finally, the States contend that the equities support their view since the injunction here "remedied a single, long-past legal violation by requiring one discrete task"—the issuance of the federal plan. In contrast, they argue, the cases cited above relate to continuing or ongoing injunctions. We see no legal basis to treat *this* injunction any differently than one that might be characterized as continuing, ongoing, or indefinite. Indeed, it is the prospective effect (rather than the continuing or ongoing nature) of an injunction that matters, and which renders the injunction amenable to modification based on new law. *See, e.g.*, *Landgraf v. USI Film Products*, 511 U.S. 244, 274 (1994) ("relief by injunction operates *in futuro*"); *Wheeling Bridge*, 59 U.S. at 431–32 (distinguishing damages, which are immune from shifts in the law, from injunctions, which are subject to changes in the law); 11 Charles Alan Wright et al., Federal Practice and Procedure § 2863, (3d ed. 2020) (distinguishing between judgment with prospective effect and judgments "that offer a present remedy for a past wrong"); *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995) (holding that a judgment is "prospective" within the meaning of Rule 60(b)(5) where it is "executory"—e.g., compels a party to perform or restrains it from performing a future act) (citing *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988)).

Accordingly, the weight of authority confirms that, once the legal basis for an injunction has been removed, such that

the law now permits what was previously forbidden, it is an abuse of discretion to not modify the injunction.

**3.**

This caselaw accords with our understandings of equity. As one leading commentator noted over 100 years ago, a "court of equity never grants an injunction on the notion that it will do no harm to the defendant if he does not intend to commit the act in question. An injunction will not issue unless some positive reasons are shown to call for it." 2 William Blackstone, Commentaries on the Laws of England and Additional Notes by Archibold, et al., *282 n.13 (George Sharswood ed. 1893) (discussing when injunctions may issue to prevent "waste"). So, even if an injunction appears to "do no harm to the defendant," it necessarily does so by its nature. *Id*. And, accordingly, we should require a "positive" basis for its imposition. *Id*. Although this commentator was discussing the need for a sufficient factual predicate to issue an injunction, we think the same reasoning requires an operative legal basis for imposing and maintaining an injunction.

Compelling EPA, then, to continue to adhere to an injunction based on a legal duty that has since disappeared is a harm in and of itself. EPA is now under no legal duty—besides the court's injunction—to promulgate a federal plan by the now-stayed November 2019 date. Because EPA's new regulations have removed the legal basis for the court's deadline, we hold it an abuse of discretion to deny EPA's request for relief under Rule 60(b)(5).

**B.**

Both sides warn that a ruling for the other side will offend the Constitution's separation of powers. We start

with the principle that no political branch of government can reverse the final judgment of an Article III court.  Because the "'judicial Power' is one to render dispositive judgments," Congress cannot retroactively reverse a final judgment.  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995).  And if Congress can't do it, an executive agency can't either.

But it is only *final* judgments, not injunctive relief, that cannot be disturbed without offending the separation of powers.  *See, e.g.*, *id.* at 226–27 (distinguishing retroactive application of a new law to cases while on appeal from judgments that have achieved "finality").  Cases involving new laws that "altered the prospective effect of injunctions entered by Article III courts," such as *Wheeling Bridge*, "distinguish themselves" from *Plaut*.  *Id.* at 232.  Indeed, this distinction was made explicit five years later, when the Court held that, "[p]rospective relief under a continuing, executory decree remains subject to alteration due to changes in the underlying law" without raising a separation of powers concern.  *Miller v. French*, 530 U.S. 327, 344, 347 (2000); *see also Landgraf*, 511 U.S. at 273–74 ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive" because "relief by injunction operates *in futuro*"); *Mount Graham Coal. v. Thomas*, 89 F.3d 554, 556–57 (9th Cir. 1996) (rejecting a separation of powers challenge based on *Plaut*'s distinction between legislation that "altered the prospective[ness] . . . of injunctions" from impermissible attempts to retroactively interfere with a final judgment); *Leavitt*, 523 F.3d at 1032 (rejecting the argument that post-injunction change to the law constituted impermissible "retroactive application" of a statute because "Congress's power to define the scope of statutory entitlements going forward is plenary").

Respect for the separation of powers also makes it irrelevant that the change in regulations in this case was brought about by EPA itself. EPA's dual role as rulemaker and defendant here is a natural consequence of a lawsuit based solely on EPA's own regulations. EPA is undisputedly the "competent authority" to modify the law at issue. *See Wheeling Bridge*, 59 U.S. at 432. As such, we see no reason why a coequal branch should be prejudiced when moving for Rule 60(b)(5) relief simply because it has the authority to amend its regulations. *Cf. NAACP v. Donovan*, 737 F.2d 67, 71–72 (D.C. Cir. 1984) (holding that the Department of Labor could implement new regulations even after a district court order required compliance with prior regulations).

Ultimately, we see a greater threat to the separation of powers by allowing courts to pick and choose what law governs the executive branch's ongoing duties. There is a word for picking the law that determines a party's *future* conduct: legislation (or in this case, rulemaking). Permitting a court to make an equitable determination about which law an executive agency should follow *going forward*, without any other legal basis, risks undue expansions of the judicial role. *See, e.g.*, The Federalist No. 78, at 284 (Hamilton) (David Wootton ed., 2003) (the legislature prescribes the "rules by which the duties and rights of every citizen are to be regulated" but the judiciary "may truly be said to have neither [f]orce nor [w]ill, but merely judgment"); The Federalist No. 47, at 234 (J. Madison) (David Wootton ed., 2003) ("Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor." (quoting Montesquieu, *Spirit of the Laws*, Vol. I, 181) (emphasis

omitted)).  It is only "[t]he *interpretation* of the laws"—not the selection of which laws should apply going forward—that "is the proper and peculiar province of the courts."  The Federalist No. 78, *supra*, at 285 (emphasis added).

## III.

We therefore hold that when a district court reviews an injunction based solely on law that has since been altered to permit what was previously forbidden, it is an abuse of discretion to refuse to modify the injunction in the light of the changed law.[7]  As courts, we are empowered to decide "[c]ases" and "[c]ontroversies."  *See* U.S. Const. art. III, § 2. We have no power to pick and choose what law the parties before us ought to follow.  Yet that is exactly what a court does when it refuses to modify an injunction that relies on a superseded law.

For the foregoing reasons, we **REVERSE and REMAND** with instructions for the district court to modify the injunction consistent with this opinion.

---

[7] Nothing in our opinion today speaks to when modification is required for consent decrees, which are not at issue here.